Johnnie D. BROWN and Louis and Leeana Brooks, Individually and on behalf of all others similarly situated, Plaintiffs under Counts I and II,

and

Calvin and Miriam Moore et al., Plaintiffs under Counts III and IV,

v.

James T. LYNN, Individually and as the Secretary of the United States Department of Housing and Urban Development, et al., Defendants,

and

L. E. Lay & Company, Inc., an Arkansas corporation and Simmons First National Bank of Pine Bluff, Arkansas, a National Banking Corporation, Defendants under Counts I and II,

and

First Federal Savings and Loan Association of Gary, an Indiana association, et al., Defendants under Counts III and IV.

No. 73 C 334.

United States District Court,
N. D. Illinois, E. D.

Oct. 11, 1974.

C. Daniel Hershenson, Seymour J. Mansfield, Legal Assistance Foundation of Chicago, Chicago, Ill., for plaintiffs.

James R. Thompson, U. S. Atty., Robert B. Schaefer, Asst. U. S. Atty., George A. Platz, III, Thomas M. Russell, Sidley & Austin, Elmer M. Walsh, Jr., H. Barringer Pusch, Thomas C. Strachen, Schumacher, Gilmore, Staub, Wade & Jones, Ronald J. Guild, Neal R. Toback, Teitelbaum, Wolfberg & Guild, Shapiro, Kreisman & Epstein, Barry M. Fisher, Fisher & Fisher, Chicago, Ill., for defendants.

## OPINION

WILL, District Judge.

The plaintiffs bring this action individually and on behalf of all other persons who either own or will own homes under section 203, 12 U.S.C. § 1709, or section 235, 12 U.S.C. § 1715z of the National Housing Act. The plaintiffs, all of whom possess mortgages under these programs, allege that the named mortgagees, by instituting foreclosure proceedings against the plaintiffs without adequate prior notice or an opportunity for a preliminary hearing, have violated both their due process rights as protected by the Fifth Amendment as well as certain contractual rights which the plaintiffs claim are the product of the federally regulated contractual relationship between the mortgagees and the Department of Housing and Urban Development (hereinafter HUD). The plaintiffs further allege that defendants Lynn and Waner, as representatives of HUD, by permitting these foreclosure proceedings, have violated their statutory obligation as defined in the applicable statutory provisions. Basing jurisdiction upon 28 U.S.C. §§ 1331, 1332 and 1361 and 5 U.S.C. § 701 et seq., the plaintiffs are seeking monetary damages in addition to declaratory and injunctive

relief. The defendants have responded by moving to dismiss for lack of jurisdiction and for failure to state a claim. For the reasons set forth hereinafter, the mortgagees' motions will be granted while the federal defendants' will be denied.

## BACKGROUND AND FACTUAL ALLEGATIONS

The two housing programs in question were instituted in furtherance of the congressional mandate to realize as soon as feasible the goal of a decent home and a suitable living environment for every American family. 42 U.S.C. § 1441. Section 203 was originally passed in 1934 and subsequently amended many times in response to a perceived housing shortage for low income families. The program is designed to make homes more accessible to low income families by means of extensive mortgage insurance which will permit mortgagees to accept limited down payments (12 U.S.C. § 1709(b)(9)), reduced interest rates (12 U.S.C. § 1709(b)(5)), and longer maturities (12 U.S.C. § 1709(b)(3)) than are otherwise available in the market. Section 235 is designed to assist lower income families in procuring homes by reducing the absolute amount due from the mortgagor through supplemental mortgage assistance payments made by the federal government directly to the mortgagee. Section 235 also provides for mortgage insurance designed to protect the mortgagee's investment against possible defaults. (12 U.S.C. § 1715z(i)).

The plaintiffs, all of whom have had their mortgages foreclosed, contend that these foreclosures have been violative of both the spirit and the letter of the National Housing Act as well as rights secured under the Constitution. As they acknowledge in their complaint, each of the plaintiffs has at some time been unable to make timely mortgage payments to the mortgagees. They indicate that in each case they notified the respective mortgagee, explaining what they considered to be legitimate reasons for their delinquent status, and expressing a willingness to make late payments as they could until they were once again current. Thereafter, all of the mortgagors tendered either late or partial payments during the ensuing months until almost every named plaintiff became current.

It is alleged that the mortgagees made no attempt during the delinquency period to ascertain the cause or status of the plaintiffs' financial plight, but after some months of arrearages, regardless of the plaintiffs' interim efforts and payments, they referred the matter to their attorneys for collection. These attorneys would then return all interim payments along with notice that unless thay receive total payment of all delinquent installments plus rather substantial attorneys' fees ostensibly representing collection services, they would institute foreclosure proceedings. After approximately two weeks, even if the plaintiffs tendered the requested mortgage payments in full, unless the attorneys' fees were also included, the mortgagees' attorneys would proceed with foreclosure. This action would impose further costs and fees upon the mortgagors.

The institution of foreclosure proceedings automatically suspends the supplemental mortgage assistance payments made by the federal government on behalf of the mortgagors under the 235 programs, 24 C.F.R. 420.7(b)(3). These payments can be reinstated retroactively only if the foreclosure action is subsequently dismissed. However, as the plaintiffs point out, the only way a mortgagor can affect a dismissal, is by tendering all payments in default, plus attorneys' fees associated with the collection attempts, plus additional costs incurred because of the foreclosure. Chap. 95, Ill.Rev.Stat., § 57. The plaintiffs maintain that, because of their already strained economic condition, they cannot meet these increased demands, and thus the institution of foreclosure proceedings is tantamount to the loss of their homes.

The plaintiffs, however, do not challenge the state foreclosure proceedings which have already withstood constitutional attack. Rather, their complaint is directed against the mortgagees, who, by allegedly arbitrarily and unilaterally instituting the foreclosure proceedings, and the federal defendants, by permitting them to do so, have violated the plaintiffs' rights. Counts I and III charge violations of the plaintiffs' Fifth Amendment right to due process. They argue that foreclosures should not be permitted before affording the plaintiffs notice and a hearing at which they could explain the reasons for any delinquencies, rebut the presentations of the mortgagees, and discuss alternatives to foreclosure. They further claim that they are being unconstitutionally deprived of their property interest in the 235 mortgage assistance payments because of the federal defendants' policy of automatically terminating with the inception of a foreclosure. Plaintiffs are seeking both declaratory and injunctive relief under these counts.

In addition to the Fifth Amendment claims, the plaintiffs also charge in Counts II and IV that they are third party beneficiaries of the contractual relationship between the mortgagees and HUD. As such, they claim to have standing to enforce the regulatory scheme which they maintain requires the mortgagees to attempt to alleviate any conditions which may jeopardize home ownership under either the 203 or 235 programs. In support of this proposition, the plaintiffs point to 24 C.F.R. § 203.9 which requires mortgagees to adopt

"Acceptable mortgage practices of prudent lending institutions."

They argue that a prudent lending institution would pursue activities such as those delineated in the HUD Guidebook, Administration of Insured Mortgages, FHA G 4015.9 (HUD Guidebook) before choosing foreclosure as a last resort. The plaintiffs contend that this guidebook contains "regulations" which have the force of law, and accordingly, re-quires the following measures be taken by mortgagees when faced with a default:

(a) *Voluntary Withholding of Foreclosure by the Mortgagee:* "The mortgagee may wait as long as one year from the date of default before starting action to acquire the property. During this period, the mortgagee can help the mortgagor by accepting reduced payments or by carrying the account in a default status." Mortgagees Guide 4015.9 at p. 16.

(b) *Special Forbearance Relief:* "The Commissioner may approve special forbearance relief if he finds that the default was due to circumstances beyond the mortgagor's control." Mortgagees Guide 4015.9 at p. 17; 24 C.F.R. 203.340.

(c) *Recasting of Mortgage:* "In addition to the Special Forbearance Relief afforded in 24 C.F.R. 203.340, if the commissioner makes the finding required in paragraph (a) of that section, he may approve a modification of the terms of the mortgage for the purpose of changing the authorization provisions by recasting the total unpaid amount due over the remaining term of the mortgage or over such longer period as he may approve." Mortgagees Guide 4015.9 at 18; 24 C.F.R. 203.342.

(d) *Assignment of Mortgage to FHA:* "Since approved mortgagees are required to service their insured mortgage accounts in accordance with the accepted practices of prudent lending institutions, there should be few instances in which the lender is unable to grant the needed relief to a deserving mortgagor when it is reasonable to believe that forbearance, recasting, or patient servicing will enable the mortgagor to receive debt-free home ownership. FHA directors are, however, authorized to accept assignment to the Secretary of mortgages in default. . . ." Mortgagees Guide 4015.9 at p. 19; 24 C.F.R. 203.350.

The plaintiffs claim that the mortgagees' failure to comply with these prescribed alternatives, and HUD's failure to enforce them, deprived the plaintiffs of their rights as third party beneficiaries of the Mortgage Insurance and Mortgage Assistance Payment contracts entered into with respect to their property. Plaintiffs accordingly seek injunctive relief compelling enforcement of these "regulations" and monetary damages for any violations.

## THE COURT'S JURISDICTION

### I

■ The federal defendants' principal jurisdictional objection rests on their assumption that the federal government may not be sued without its specific consent. They cite numerous cases in support of the concept of sovereign immunity which have little or nothing to do with the National Housing Act. A plain reading of that Act, however, reveals that the United States Government, acting through the Department of Housing and Urban Development, has statutorily consented to be sued in cases arising under this law. As set forth in 12 U.S.C. § 1702:

> The Secretary shall, in carrying out the provisions of . . . subchapter II [mortgage insurance] . . . be authorized in his official capacity, to sue and be sued in any court of competent jurisdiction, State or Federal.

This section is an effective waiver of sovereign immunity, and, as numerous decisions have concluded, the federal courts have the power to enforce the provisions of this Act against the Federal Government. Federal Housing Administration v. Bern, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940); Northwest Residents Ass'n v. HUD, 325 F. Supp. 65 (E.D.Wis.1971); Powelton Civic Homeowners Ass'n v. HUD, 284 F.Supp. 809 (E.D.Pa.1968). Federal question jurisdiction is therefore clearly proper in the instant suit.

■ As to the specific issue of whether the federal defendants have violated their duty to provide a decent home to the plaintiffs, we find ample authority for assuming jurisdiction under either the Administrative Procedure Act, § 10, 5 U.S.C. § 701 et seq., or the Mandamus and Venue Act of 1962, 28 U.S.C. §§ 1361, 1391(e). The courts have repeatedly held that the Administrative Procedure Act provides an independent basis for jurisdiction where the aggrieved party is seeking review of actions of a Federal Agency. Davis v. Romney, 355 F.Supp. 29 (E.D.Pa.1973), aff'd in part, 490 F.2d 1360 (3rd Cir. 1974). This source of jurisdiction is available to determine whether the federal defendants' discretionary acts conform to their statutory obligations.

■ The plaintiffs are also entitled to seek to mandamus federal officials who have abused their discretion, acted beyond the scope of their authority, failed to fulfill their statutory responsibilities, or failed to take actions within the legal limits of their authority. Peoples v. United States Department of Agriculture, 138 U.S.App.D.C. 291, 427 F. 2d 561 (1970). As set forth in Davis v. Romney, *supra*, where HUD officials have either failed to fulfill their ministerial functions or abused their discretion, mandamus is a proper form of relief. It thus clearly applies to allegations of HUD's failure to fulfill its mandated obligation.

■ We further find the federal defendants' suggestion that the plaintiffs do not have standing to challenge HUD's actions under either of these latter two statutes, to be without merit. The plaintiffs clearly meet the test for standing as set forth by the Supreme Court in Ass'n of Data Processing Services Organization v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). The plaintiffs have all purchased homes under these housing programs enacted in furtherance of the national housing goal of

a decent home and suitable living environment for every American family. They claim, however, that the federal defendants have frustrated this goal causing the plaintiffs to be wrongfully deprived of their homes. Such consequences clearly affect the plaintiffs, who have a personal stake in this litigation, as well as falling within the zone of interests sought to be protected by the programs. Talbot v. Romney, 334 F. Supp. 1074 (S.D.N.Y.1971); Davis v. Romney, *supra*. As aptly expressed by the court in *Davis*:

> This declaration [42 U.S.C. § 1441] demonstrates Congress' intention to include persons such as the plaintiffs amongst the beneficiaries of the National Housing Act and to place them within the groups whose interests it protects. From the wording of the National Housing Act and from the wide variety of interests that the Courts now recognize, we find that the plaintiffs in the case at bar are within the 'zone of interests' sought to be protected by it. Plaintiffs are the ones who have primary interest in their housing needs, which is the whole purpose of the Act, to provide them with safe adequate housing at a price which is within their limited means. No other group, but the plaintiffs, surely not the . . . mortgagees . . . can be considered so concerned about seeing that the mandate of Congress expressed in the National Housing Act is carried forth and faithfully so. No other group but the plaintiffs can be adversely affected by disregard for the provisions of the Act. If the Act does not function properly or is not administered properly, they are the first to suffer.

Having alleged injury in fact, and because they are clearly within the required zone of interests, the plaintiffs have standing to bring this aspect of their complaint.

## II

The mortgagee defendants' jurisdictional challenge is directed only at the plaintiffs due process claims in Counts I and III. Relying upon the holding in Public Utilities v. Pollack, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952), they point out that the Fifth Amendment "apply to and restrict only the Federal government and not private persons." Given this limitation, they argue that no action against the mortgagees can be founded upon this Amendment.

The mortgagee defendants' statement of the general rule, however, does not apply to the facts and circumstances of the instant case. Rather, it is well recognized that where private individuals' actions are sufficiently suffused with government involvement, such actions do come within the purview of the Fifth Amendment. We find the interdependency between the government and the mortgagees here presents a classic example of the type of relationship which requires extending such coverage.

In support of this conclusion, we have only to look at the rather elaborate regulatory scheme by which the government provides incentives and protections to induce the mortgagees to enter into these essentially risk free mortgage contracts. But for the provisions of these federal programs, with their guaranteed insurance and assistance payment subsidies, the mortgages in question probably would never have come into existence.

Government influence is further reflected in the control and regulation which the mortgagees are subjected to when they become participants in these programs. Only mortgagees which have been approved by HUD may hold or service mortgages under 203 or 235 programs. The mortgagees are supposedly subject to continuing inspection and supervision by HUD. The mortgages themselves are restricted as to the amount, the type of property eligible, the interest rates chargeable, the mort-

gagor's down payment, the amount the mortgagee can charge for fees and discounts, the amortization of payments, and the incidence and amount of late charges.

It is readily apparent from the foregoing considerations that the mortgagees are inextricably intertwined in the dispensing of these government conceived and controlled benefits. The programs depend upon the mortgagees to supply the end product, and the mortgagees rely on the government to protect their investment. The symbiotic relationship makes the programs functional. Accordingly, the mortgagees necessarily must be subject to the same constitutional proscriptions as the government, which means, where applicable, meeting the due process requirements of the Fifth Amendment. This court therefore has jurisdiction over the mortgagees as to these claims.

## FAILURE TO STATE A CAUSE OF ACTION

### III

The plaintiffs' Fifth Amendment claim charges the defendants with depriving them of their property interests in their homes and in their mortgage assistance payments under the 235 program without first affording them the constitutionally guaranteed due process rights to notice and a hearing. They maintain that, if they had an opportunity to explain any deficiencies and to work out a realistic and mutually acceptable plan for becoming current in accordance with the HUD guidelines, none of the foreclosures listed in the plaintiffs' complaint would have reached the state courts.

Instead, because the defendants have not extended these protections prior to their referral of the matter to their collection attorneys, the plaintiffs maintain that they are being placed in an un-

tenable financial position where it is impossible to prevent the loss of their homes. As disclosed by the plaintiffs uncontroverted affidavits, the mortgagees' collection attorneys are apparently charging high fees for what appears to be the mailing of a collection notice threatening foreclosure. Unless the mortgagor pays all existing deficiencies as well as these attorney's fees, the mortgagees institute foreclosure proceedings which apparently give rise to even greater costs and attorney's fees. Since, under the Illinois Mortgage Foreclosure Act, Chap. 95, Ill.Rev.Stat. § 23 et seq., the only defense to a foreclosure is the tender of the entire arrearage, plus all costs, fees and expenses, the mortgagors, who are already under severe financial strain, find it virtually impossible to reinstate. The initial referrals thus appear to seal the mortgagors' fates. In an effort to prevent what they consider to be an unnecessary and unwarranted loss of their homes, the plaintiffs move in Counts I and III for a holding requiring the institution of preliminary due process proceedings by HUD or the mortgagees prior to any such referral or foreclosure.

Notwithstanding the plaintiffs' Fifth Amendment claim, if their allegations are true, and they are in fact losing their homes largely because of attorney's fees, we find such conduct to be unconscionable. It would be a national disgrace if programs designed specifically for the poor were being subverted for the benefit and financial gain of mortgagees and their agents. Especially is this so, if, as it has been suggested, it is financially preferable for mortgagees to move for an early foreclosure.[1] Regardless of motivation, we find it difficult to justify such excessive fees, in light of the actual arrearages owed, the nature of the programs, and the apparent perfunctory services giving rise to the charges.

---

1. *See generally* Comment, Exploiting the Homebuying Poor: A Case Study of the Abuse of the National Housing Act, 17 St. Louis L.J. 525, 543–44, 546–60 (1973); Hood and Kushner, Real Estate Finance: The Discount Point System and Its Effect on Federally Insured Home Loans, 40 Univ. Mo.K.C.L.Rev. 1 (1971).

While we have not been asked, nor do we have jurisdiction to pass upon the propriety of these fees, we are nonetheless distressed by the fact that low income mortgagors appear to be losing their homes because of illness, temporary unemployment, or similar emergencies, which have caused them to temporarily default in their mortgage payments. This is not to suggest that all named mortgagees and their agents, or for that matter, most mortgagees and their agents, do not generally deal fairly and compassionately with mortgagors facing financial crises. Nor do we wish to paint all mortgagors as unfortunate and abused victims of callous indifference on the part of the mortgagees. We recognize that some mortgagors take unfair advantage of these programs and that mortgagees do indeed have investments to protect. We are only disturbed by what, in some instances, appears to be impossible burdens for these particular plaintiffs to overcome in order to save their homes, burdens imposed contrary to both HUD guidelines and the Congressional objectives set forth in the applicable statutes.

What is particularly disturbing is that HUD, which was given the responsibility by Congress to administer these programs, has apparently preferred to become the largest owner of abandoned slum buildings in the Chicago area rather than monitor these mortgagees or take steps to assist mortgagors with bona fide temporary economic crises. These consequences are apparently avoidable as HUD presently has procedures which could prevent these foreclosures. The aforementioned attorney's fees, for instance, have been expressly limited by the HUD guidelines. Chap. 7, § 107(d), provides in relevant part:

> Mortgagees may use an attorney for the collection of past due amounts. However, there are limitations on attorney's fees which may be properly chargeable to the mortgagor. An attorney's fees may be imposed and collected only in those cases where the lender has made a decision to foreclose the mortgage, referred the case to an attorney for foreclosure proceedings, and subsequent reinstatement takes place. In such cases, the attorney would be entitled to a fee which is both reasonable and customary in the area, plus expenses incurred in the action, which would be payable by the mortgagor. Any attorney's fee collected from the mortgagor as a condition of reinstatement must be limited to fees earned to the date of reinstatement. Neither the writing of a collection letter by a staff attorney, which is unrelated to foreclosure proceedings, nor any other routine servicing by an attorney, will warrant legal fees being passed on to the mortgagor.

However, HUD has repeatedly stressed in the course of this litigation that the guidelines are merely suggestions as to the proper servicing of low income mortgages. The guidelines, HUD asserts, do not have the force of law and HUD is not required to compel the mortgagees to follow them. HUD contends that the only appropriate sanction for failure to follow the guidelines is removal of the mortgagees from the program.

Notwithstanding, even if HUD was committed to preventing inordinate attorney's fees, under the present reporting procedures we can perceive of no way, absent an unsolicited notification by the mortgagor, that HUD would even learn of such fees. Forms required to be sent to HUD by the mortgagees in the event of a foreclosure do not require the disclosure of collateral costs or fees. Moreover, the record in this case indicates that HUD's own investigative techniques are generally inadequate to uncover alleged abuses. HUD's asserted inability to prevent the unnecessary loss of homes under these circumstances emerges as being highly suspect.

But even before these matters reach the stage when the mortgagee defendants might need the services of a collection attorney, the HUD guidelines provide mechanisms which, if judiciously employed, could provide procedural safeguards consistent with the mortgagors'

needs. Form HUD–9805, for instance, which the guidelines specifically require be sent to a defaulting mortgagor, not only notifies him of the consequences of continued default but also suggest that, if hardship exists, the mortgagor should contact the local HUD office for assistance. HUD, however, acknowledges that, since the guidelines are not enforced, this form is used infrequently, a conclusion which is amply supported by the fact that none of the plaintiffs apparently received this prescribed form. Rather, the mortgagor's first notification of the possibility of losing their homes seems to be the in terrorem letter from the mortgagees' attorneys threatening imminent foreclosure.

Another form which could be used to apprise HUD of a salvageable mortgage situation before an unnecessary foreclosure is FHA–2068F. This form permits a mortgagor to set forth his financial situation, explain the reasons for any late payments, and propose a plan for curing any deficiency. However, as the form is currently utilized, it does not provide a direct means by which the mortgagor can seek HUD's counsel or protection. The form is merely part of a package that the mortgagee must submit to HUD if it is attempting to get out from under a high risk mortgage by assigning the mortgage to HUD. The decision to request an assignment, as opposed to seeking other resolutions of the problem, lies totally within the mortgagees' discretion. The use of the form is thus totally a product of mortgagee action. Moreover, the professed purpose of the form is to reassure HUD that, if it was to accept the assignment, it would not be receiving a mortgage which was already beyond recovery. Thus, while Form FHA–2068F could serve as an ideal means for alerting HUD to a mortgagor's financial dilemma, it is not so used. Once again, HUD appears to be insensitive to its responsibility to establish and enforce procedures reasonably calculated to protect the mortgagors from premature foreclosures.

But even though we may object to the mortgagees' alleged precipitous foreclosure practices, and we find HUD's unwillingness or inability to enforce these programs to be reprehensible, it does not necessarily follow that such conduct is actionable under the plaintiffs' Fifth Amendment theory. While we recognize that these plaintiffs may have reached the point of no return long before the judiciary becomes involved, only the state courts have the ultimate authority to divest the plaintiffs of their interest in their homes. The act of filing the foreclosure action is clearly distinguishable from the final decision rendered by the state court. Since the state court is the sole body capable of acting upon the plaintiffs' property interests, the burden falls on it to provide formal due process safeguards, and not the defendants.

Since the state foreclosure proceeding has already passed constitutional muster, and the plaintiffs do not challenge it here, we must conclude that the state courts provide the prescribed due process minima. The Fifth Amendment does not require two separate hearings where one has been found to fairly protect the plaintiffs' interests. Goldberg v. Kelly, 397 U.S. 254, 267, n. 14, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1969). The plaintiffs' attempt to require protection through two trial-like proceedings occurring both before and after the institution of the state proceedings is therefore not supportable under the Constitution. Consequently, the plaintiffs' claims in Counts I and III charging the loss of their homes without due process must be dismissed.

## IV

Nor do we find HUD's policy of automatically suspending 235 mortgage assistance payments upon the filing of foreclosure proceedings to be violative of the Fifth Amendment. The plaintiffs, relying upon the Supreme Court's rulings in Goldberg v. Kelly, *supra*, and its progeny, have urged that,

they should be afforded notice and a hearing before these benefits are arbitrarily cut off. In upholding the need for such due process protections in Goldberg v. Kelly, the Court found that public assistance recipients had a statutory entitlement to welfare benefits grounded in the statute defining eligibility. From this entitlement, which was within the sphere of property interests meriting constitutional protection, it was determined that, on balance, the consequences to the recipient of wrongful termination outweighed the governmental interest in conserving fiscal resources through summary action. The Court concluded that, under the circumstances, the Fifth and Fourteenth Amendments required that welfare recipients be afforded an evidentiary hearing before suspension of their benefits. Similarly, the Supreme Court has also held that a hearing is required before wages can be garnisheed. Sniadach v. Family Finance Corporation, 395 U.S. 337, 89 S.Ct. 1820, 23 L. Ed.2d 349 (1969); a driver's license revoked, Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); consumer goods repossessed, Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L. Ed.2d 556 (1972); or a tenured college professor fired by a public educational institution. Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

The plaintiffs have likened their experience to those found to exist in these cases, contending that the mortgage assistance payments were specifically designed to make homes available for low income families and, therefore, under the provisions of the National Housing Act, these payments qualify as statutory entitlements. The plaintiffs thus reason that the mortgage assistance payments represent property interests which cannot be suspended without adequate notice and a fair hearing. Since the government's present practice is to automatically suspend the mortgage assistance payments upon the institution of foreclosure proceedings, the plaintiffs argue that they have suffered unconstitutionally irreparable injury by being denied both the means to pay for their homes as well as being irrevocably condemned to the loss of the government benefits. We find this claim to be without merit.

■ In applying the *Goldberg* rule, the courts necessarily must employ a balancing test. In contrast to the government's administrative and fiscal interest, the courts must pay particular attention not only to the nature of the individual's interests at stake but also the extent to which the individual faces imminent loss or injury. Thus, in finding in favor of the plaintiffs in *Goldberg*, the Court observed that "termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate." 397 U.S. at 264, 90 S.Ct. at 1018. Similarly, in *Sniadach*, the Court concluded that the deprivation of an individual's wages could "as a practical matter drive a wage-earning family to the wall," 395 U.S. at 341–342, 89 S.Ct. at 1823, and in Bell v. Burson, it was determined that the petitioner, who was a clergyman, was severely handicapped in the performance of his ministerial duties by the suspension of his driver's license. 402 U.S. at 537, 91 S.Ct. 1586. In each set of circumstances, the Court found that the nature and the extent of the injury necessitated the imposing of Fifth Amendment protections.

No such threatened injury or loss is involved in the instant case. The suspension of these mortgage assistance payments has no practical impact upon either the mortgagors' continued physical presence in their homes or their financial obligations arising out of the foreclosure proceedings. In contrast to *Goldberg* where the welfare recipients were faced with the immediate loss of their means of support, under the Illinois Mortgage Foreclosure Act, mortga-

gors found to be in default may be permitted to remain in their homes as long as fifteen months after the entry of the decree of foreclosure. These mortgagors are, therefore, not faced with the danger of suddenly finding themselves without a roof over their heads, and in view of the time elements at play here, we do not find procedural safeguards are necessary to preserve the mortgagors' physical well being.

Nor do the mortgage assistance payments appear to have any effect upon the mortgagors' legal interest in their property. Contrary to what the plaintiffs have suggested, the state courts do not take the suspended assistance payments into account when determining the amount necessary for reinstatement. The 235 mortgagors are only liable for the deficiencies which they owe directly to the mortgagees, in addition, of course, to reasonable attorney's fees and other related costs. The assistance payments, on the other hand, are the subject of a separate contract running solely between HUD and the mortgagees. The obligation for making these payments is exclusively HUD's, and the payments are made directly to the mortgagees and are not within the dominion or control of the mortgagors. In the event of foreclosure, the responsibility for these payments does not shift to anyone else, it merely lapses pending the outcome of the foreclosure proceeding. If the mortgagor reinstates, the payments are resumed retroactively; if the mortgagor does not, then the suspended payments are covered by the mortgage insurance.

Because the state courts do not consider the government's obligations to the mortgagees in assessing the mortgagor's fiscal responsibilities vis a vis reinstatement, and the mortgagors do not suffer any out-of-pocket expense or loss because of the suspension of payments, the plaintiffs do not suffer any injury by the government's suspension. Moreover, since the payments are paid retroactively upon reinstatement, and the mortgagors have at all relevant times remained in their homes, the plaintiffs have not been deprived of the benefits of these assistance payments by the government's present practices. Clearly, if the mortgagors are unable to reinstate, no real purpose is served by continuing the assistance payments during the redemption period. Accordingly, since the government's procedure of automatically suspending mortgage assistance payments upon the institution of foreclosure proceedings appears to have no practical effect upon either the mortgagors' presence or interest in their homes, and does not give rise to any apparent loss or injury to them, we find that a pre-suspension hearing is not constitutionally required.

V

The plaintiffs assert in Counts II and IV that the defendants are guilty of violating federal regulations by not pursuing prescribed alternatives before resorting to foreclosure. The regulations relied upon by the plaintiffs are 24 C.F. R. §§ 203.9, 203.340, 203.342, and 203.-350. Of these, only § 203.9 is couched in mandatory terms. It deals with the qualifications and responsibilities of mortgagees and requires them to adopt the practices of a prudent lending institution when servicing mortgages under these programs.

Plaintiffs' concept of a prudent lending institution would appear to make the interests of a defaulting mortgagor paramount, placing them well before those of the institution attempting to protect its own investment. They maintain that, under the circumstances facing the plaintiffs in this case, a prudent lending institution would not only defer foreclosure proceedings, but would also actively pursue alternatives which would afford the mortgagors an opportunity to become current. They point to the other aforementioned regulations as well as the HUD guidelines as a source of these alternatives, which include, inter alia, accepting partial payments, recasting the mortgage, or assigning the mortgage to the FHA.

While in many instances such alternatives are certainly preferable to foreclosure, the plaintiffs' reliance on § 203.9 as a means of enforcing these alternatives is misplaced. The role of a prudent lending institution in the marketplace cannot be defined so narrowly as the plaintiffs suggest, but rather, the very nature of the mortgagees' business and financial relationship with their clients also requires prudence in protecting their own investments. Section 203.9 itself proposes that the mortgagees should exercise "due diligence in collecting amounts due." Their failure to do so may result in termination of the government's guarantee against their loss. Accordingly, the ambiguous and multipurpose concept of a prudent lending institution cannot be read to compel the mortgagees to seek alternatives to foreclosure where deficiencies in fact exist, and they have acted within the limits of the state foreclosure procedures. Based upon the language of § 203.9, we do not find the foreclosure decisions of the defendant mortgagees to be so imprudent as to require court interference.

Nor may the plaintiffs rely upon the other regulations to prevent alleged precipitous foreclosures by mortgagees. These regulations unfortunately are clearly expressed as alternatives which the mortgagees *may* turn to if they so choose. They are not obligatory directives. By virtue of the permissive language present in each regulation, the defendant mortgagees are not compelled to follow these measures in lieu of foreclosure.

Finally, the HUD guidelines upon which the plaintiffs have particularly relied as a source for the "regulatory" scheme underlying these programs, have not been issued pursuant to the Administrative Procedure Act. As such, they only contain statements of policy and not regulations, per se, having the force and effect of law. Faggins v. Kassler & Co., 72 C 125 (N.D.Ill., July 26, 1972). Statements of policy have no binding effect upon the mortgagees, FHA v. Morris Plan Co., 211 F.2d 756 (9th Cir. 1954), and are unenforceable in the courts. *Faggins, supra.* The guidelines, in their present form, therefore, cannot be used to require the mortgagees to pursue the alternatives listed therein, and, accordingly, do not give rise to a claim of a duty owed or a remedy. Those allegations in Counts II and IV as directed toward the mortgagees must be dismissed for failure to state a claim.

## VI

But while the mortgagees can escape liability for any alleged abuses by merely acting within the parameters of HUD's enforceable regulations, HUD may not hide behind its own alleged subversion of the national housing policy. For HUD to argue its guidelines for servicing these programs are only suggestions which it need not and will not enforce, regardless of the apparent impact upon the supposed beneficiaries of these programs, only exposes the likelihood that HUD has failed to act in furtherance of the congressionally mandated housing policy. HUD had and has a statutory obligation to formulate and carry out a program reasonably calculated to provide a decent home and a suitable living environment for every American family. 42 U.S.C. § 1441. In pursuit of this objective, the National Housing Act imposes the following obligations upon HUD:

> The Department of Housing and Urban Development, and any other departments or agencies of the Federal Government having powers, functions, or duties with respect to housing, shall exercise their powers, functions, and duties under this or any other law, consistently with the national housing policy declared by this Act and in such a manner as will facilitate sustained progress in attaining the national housing objective hereby established, and in such manner as will encourage and assist (1) the production of housing of sound standards of design, construction, livability, and size for adequate family life; (2) the

reduction of the costs of housing without sacrifice of such sound standards; (3) the use of new designs [etc.] and the increase of efficency on residential construction and maintenance; (4) the development of well-planned, integrated, residential neighborhoods and the development and redevelopment of communities; and (5) the stabilization of the housing industry at a high annual volume of residential construction.

As expressed in Pennsylvania v. Lynn, 501 F.2d 848, at 855 (D.C.Cir. 1974), "this statute is not precatory. HUD is obligated to follow these policies. Action taken without consideration of them, or in conflict with them, will not stand, Shannon v. United States Department of Housing and Urban Dev., 436 F.2d 809 (3rd Cir. 1970); Garrett v. City of Hamtramck, 335 F.Supp. 16, 26 (E.D.Mich.1971); see Talbot v. Romney, 334 F.Supp. 1074, 1079 (S.D.N.Y.1971)."

■ Consistent with such authority, the plaintiffs argue that the federal defendants' failure to promulgate and enforce a continuing regulatory scheme which would prevent scores of premature foreclosures stands in direct contravention of the national housing goal. Because of HUD's unwillingness to intervene on the mortgagors' behalf, the plaintiffs point out that HUD has now become the largest owner of abandoned dwellings in our urban communities. By HUD's own admission, as of April 30, 1974, it possessed approximately 78,000 foreclosed single family dwellings. In Chicago alone, HUD has in excess of 2,200 vacant homes and defendant Waner anticipates about 5,000 more in the coming months. Conservative estimates now place the expected failure rate of a program such as 235 at almost one dwelling in five. The impact upon the urban community is substantial, not only in terms of the displaced and traumatized families, but also because of the lost housing, increased fire hazard, vandalism and blight. Such adverse consequences are plainly in conflict with the program objective to facilitate progress in providing decent homes, suitable living environments, and properly developed communities. Attributing the premature and unnecessary loss of their own homes to the inadequate structure and application of the 203 and 235 programs, we find that the plaintiffs' allegations state a valid cause of action against HUD.

In the face of such consequences, the federal defendants seek to dismiss, raising the defences (1) that their stance on foreclosures does not exceed their broad discretionary powers, and (2) their implementation of these housing programs is adequate and in keeping with the Congressional objectives. They argue first that Congress has left the formulation of foreclosure policies solely to HUD's discretion. Since there are no Congressional directives on the subject, HUD contends that its decision to allow the mortgagees to have control over individual foreclosure decisions so long as they remain within the limits of state authorized mortgage servicing practices and the prudent lender standard, is both reasonable and appropriate. We cannot agree.

Such a policy reflects HUD's intention to treat these low-income mortgagors no differently than mortgagors holding standard mortgages. Apparently, HUD believes its commitment to these families is limited to assisting them in initially acquiring a mortgage, but that their commitment somehow evaporates thereafter. Thus, notwithstanding the high-sounding and purposeful language of HUD's own guidelines stressing policies supposedly designed to preserve home ownership, in reality, HUD has thrust these low-income mortgagors into the marketplace subject only to the benevolence of "prudent" mortgagees and the state courts. Such an abdication of its responsibility is clearly inadequate as evidenced by the apparent insensitivity and arbitrariness in the instant cases. The situation is made further suspect by the plaintiffs' contention that HUD has

constructed these programs so that it is financially advantageous for mortgagors to move for an early foreclosure.

If the allegations of the complaint and the uncontroverted affidavits filed by plaintiffs are correct, HUD has tragically misled thousands of low-income Americans. Believing, as Congress apparently intended, that a policy and program had been adopted which would enable them to acquire a home notwithstanding their marginal financial circumstances, these low-income families entered in good faith into purchases and mortgages which they would otherwise not have been able to do. As reflected in the HUD guidelines, the program apparently contemplated the necessary flexibility to deal with the inevitable temporary crises such as illness, temporary unemployment, etc., which all involved in the program knew would occur. Extensions, recasting of the mortgages, purchase of the mortages by the FHA prior to foreclosure and their subsequent recasting, all were obviously necessary to carry out the Congressional purpose as the guidelines recognize.

Yet HUD has done nothing to insure that these procedures would be followed. On the contrary, by stressing the "prudent lenders" standard as a condition to its continued commitment to hold the mortgagees harmless against any loss and making its guidelines unenforceable, HUD, contrary to its statutory obligation, has forced foreclosures rather than taking action to prevent them. If HUD had consciously and deliberately set out to frustrate the Congressional purpose and sabotage the program, it could hardly have done so more effectively short of simply refusing to carry it out. Accordingly, in light of what has to be an ongoing responsibility to ensure home ownership, we find that, if HUD's policy on foreclosures has brought and continues to bring about a rash of unwarranted defaults and foreclosures as alleged, this constitutes an abuse of discretion in violation of the National Housing Act. Any such abuses are actionable under either the Administrative Procedure Act or in a mandamus proceeding.

We are further unpersuaded by HUD's protestations that it does adequately enforce these programs by terminating mortgagees which it finds are in violation of the prudent lender standard. Such an argument immediately raises questions of the adequacy of the criteria used to evaluate whether sanctions are necessary; the sufficiency of HUD's investigative and monitoring procedures; the extent to which such sanctions are actually employed; and the impact on the mortgagees' practices. These are all factual questions which take this issue out of the realm of a motion to dismiss.

It is also significant that HUD's interpretation of adequate enforcement does not provide any means for redressing a mortgagor who has been the victim of unfair treatment. We are unaware of any relief that HUD could or does afford a mortgagor who has unnecessarily lost his home by a mortgagee's precipitous foreclosure decision. At worst, the mortgagee will lose its acceptance in the program which is of little consolation to a mortgagor without a home. Those results seem to reflect that HUD has lost sight of who the Congress intended should be the beneficiaries of these low income programs. These programs were not created for the benefit of the mortgagees, although we have been constantly struck by HUD's insistence upon supporting and condoning the mortgagees' challenged practices. HUD's preoccupation with its commitment to the mortgagees seems to support the impression that HUD has failed to fulfill its obligation to the low-income homeowners. Such conduct reflects a frustration of the national housing goal, and further contributes to a finding of a valid cause of action. Accordingly, based on the foregoing considerations, we find that the plaintiffs have stated a valid claim and the federal defendants' motion to dismiss this aspect of the plaintiffs' complaint must be denied.

In summary, we find that the plaintiffs have properly invoked jurisdiction over all of the named defendants under both their Fifth Amendment claim and their statutory claim. All of the defendants' respective motions to dismiss on this ground are therefore denied. We further find that the plaintiffs have failed to state a proper cause of action under their constitutional due process claim, or the claim against the mortgagee defendants for breach of HUD's regulations. Finally, we find that the plaintiffs have asserted a valid claim against HUD for the alleged violation of its statutory obligation under the National Housing Act. An order consistent with the foregoing will enter.