UNITED STATES of America, Plaintiff,

v.

AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, Trustee under Trust No. 22 75624–001 and Salem Cross Associates, Curtis-Dodd Group Ltd., Richard Mook, Gordon J. Dicke, Lawrence J. Janota, Riverdale Bank, Calumet City Plumbing Co. and William B. Potts d/b/a B & S Decorating Service, Defendants.

No. 75 C 1514.

United States District Court,
N. D. Illinois, E. D.

Nov. 17, 1977.

Samuel K. Skinner, U. S. Atty., F. H. Branding, Asst. U. S. Atty., Chicago, Ill., of Counsel; Dennis S. Brinn, Dept. of Housing and Urban Development, Washington, D. C., for plaintiff.

John B. Simon and Dana H. Freyer, Friedman & Koven, Chicago, Ill., for Defendant Curtis-Dodd Group, Ltd. (All other defendants in default).

## MEMORANDUM OPINION

MARSHALL, District Judge.

The United States has brought this action under 28 U.S.C. § 1345 on behalf of the Secretary of Housing and Urban Development (HUD) to foreclose a $3,019,600 mortgage on an apartment complex in Lansing, Illinois. Beneficial ownership of the property was originally vested in Salem-Cross Associates (SCA), a partnership, and its three general partners. SCA entered into a trust agreement on May 1, 1971 with American National Bank & Trust Company of Chicago (American National), by which the bank held legal title to the property. On that same date, American National executed and delivered a note and mortgage on the property for $3,019,600 to Great Lakes Mortgage Corporation, the mortgagee. The note and mortgage were insured by the Federal Housing Administration (FHA), a division of HUD, under section 221(d)(4) of the National Housing Act, 12 U.S.C. § 1715*l* (d)(4). Section 221 provides for a program of federally-insured mortgages on low cost homes and moderate income projects. 24 C.F.R. § 200.33. As part of the same financing transaction, SCA signed a regulatory agreement with HUD by which it agreed, *inter alia*, to lease the apartments, collect the rents, apply them to satisfaction of the outstanding mortgage, keep the premises in good repair, and maintain books and accounts of the financial operations of the property. According to the allegations of the amended complaint, on June 1, 1974 SCA and its trustee-bank defaulted on the mortgage payments. Thereafter, the Secretary of HUD acquired ownership of the note and mortgage on the property by virtue of an assignment from an assignee of Great Lakes Mortgage Corporation, the original mortgagee. Although the complaint and record are silent on the matter, the normal procedure in the case of a default on a federally-insured mortgage is for the FHA to pay the insurance funds to the mortgagee in the form of debentures in return for assignment of the defaulted mortgage, with the Secretary of HUD then becoming clothed with all the rights and obligations of the mortgagee. *See* 24 C.F.R. § 200.153 *et seq.; Lindy v. Lynn*, 395 F.Supp. 769, 773 (E.D.Pa.1974), *affd.* 515 F.2d 507 (3d Cir. 1975).

In April, 1975, SCA assigned its beneficial interest in the property to Curtis-Dodd Group, Ltd. (Curtis-Dodd). There is a dispute concerning whether this assignment received the approval or authorization of the Secretary, as was required by the regulatory agreement between SCA and HUD. In any event, it is undisputed that Curtis-Dodd took over the management of the property on April 11, 1975, when it entered into a "Project Management Contract" with HUD. Under this contract, Curtis-Dodd agreed, *inter alia*, to lease the apartments, collect the rents, deposit them in a special account, and maintain financial records in return for a percentage of the rental income on the property.

On May 12, 1975, the United States filed its complaint seeking to foreclose on the mortgage and naming SCA, its general partners, and American National as defendants. Later the Government added Curtis-Dodd and certain other interested parties as defendants. On October 12, 1976 all defendants except Curtis-Dodd were adjudged

to be in default. Curtis-Dodd answered denying certain aspects of the amended complaint and counterclaimed seeking declaratory and equitable relief against the Government.

In an effort to clear this last remaining defendant from the Government's march to the auction block, the United States has filed a motion to voluntarily dismiss Curtis-Dodd as a defendant, to strike and dismiss its counterclaim, and for summary judgment. In its reply brief, the Government withdrew its motion to voluntarily dismiss Curtis-Dodd. Therefore, we will confine our discussion to the legal sufficiency of Curtis-Dodd's counterclaim and the propriety of the entry of a decree of foreclosure on the motion for summary judgment.

Curtis-Dodd's counterclaim raises issues which substantially enlarge the scope of the Government's action. In the amended complaint, the Government only sought a declaration of the amount unpaid on the note and mortgage and a decree of foreclosure on the property. In its counterclaim, Curtis-Dodd attempts to trace the causes of the default on the mortgage and to pin blame or responsibility on HUD for its alleged failure to follow its statutory and regulatory mandate. The thrust of the counterclaim is that HUD, through its failure to supervise and monitor the financial activities of the original parties to the mortgage, allowed SCA to divert the rental income, thereby creating a large delinquency on the mortgage and causing the physical and economic decline of the project. In addition, Curtis-Dodd claims that HUD failed to pursue and recover the misapplied funds by an action for an accounting or by civil and criminal prosecutions against SCA. Finally, Curtis-Dodd alleges that HUD failed to prevent foreclosure by utilizing less drastic financing alternatives which would have allowed Curtis-Dodd to continue its operations of the project on a sound financial basis and which would avoid the fiscal losses to the United States resulting from an expected sale of the property at foreclosure at a price which is insufficient to cover the outstanding indebtedness. Although the counterclaim cites no specific laws, it alleges that these acts and omissions by HUD violate United States statutes, HUD regulations, the mandate of Congress, and the public interest. In its prayer for relief, Curtis-Dodd seeks a declaration that HUD has violated these laws and is not entitled to foreclosure. It also asks the court to order HUD to account for and collect the misapplied funds and to apply its regulatory authority to modify the mortgage, thereby allowing Curtis-Dodd to remain as manager and beneficial owner of the project.

In its motion to dismiss, the Government argues that the counterclaim is barred by principles of sovereign immunity, lacks a jurisdictional basis, and fails to state a claim on which relief can be granted.

■ It is fundamental that the United States may be sued only to the extent that it has waived its sovereign immunity. This immunity extends to counterclaims and cross-claims. *United States v. Shaw*, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888 (1940). The defense is a jurisdictional one but can be waived either by statute or by the government's filing of a suit. *Federal Savings & Loan Ins. Corp. v. Quinn*, 419 F.2d 1014, 1017 (7th Cir. 1969). Section 1702 of Title 12 authorizes the Secretary of HUD to sue and be sued in his official capacity in actions arising under the National Housing Act. This statute is an effective waiver of sovereign immunity on the part of the Secretary and federal courts have the power to enforce the Act against the federal government. *Baker v. F & F Investment Co.*, 489 F.2d 829 (7th Cir. 1973); *Estrada v. Hills*, 401 F.Supp. 429 (N.D.Ill.1975); *Battles Farm Co. v. Hills*, 414 F.Supp. 521 (D.D.C. 1976). However, the counterclaim here is directed against the United States, not the Secretary. The general rule is that where the United States is the real party in interest, statutory authority for the federal official to be sued does not operate as a complete waiver of the sovereign immunity of the United States. *Waylyn Corp. v. United States*, 231 F.2d 544 (1st Cir. 1956); *United States v. Gregory Park, Section II, Inc.*, 373

F.Supp. 317, 351 (D.N.J.1974). The rule is founded on the principle that the statutory waiver in § 1702 restricts the funds available to satisfy a money judgment to those appropriated under the Act. A complete waiver would exceed the boundaries of this limited consent by permitting execution against any funds or property of the United States. *Waylyn, supra,* 231 F.2d at 546, *quoting Federal Housing Administration, Region No. 4 v. Burr,* 309 U.S. 242, 250, 60 S.Ct. 488, 84 L.Ed. 724 (1940). The rule fails its essential purpose here where the counterclaimant is not seeking direct monetary relief against the government, but only asks for declaratory relief, an accounting and collection of misspent funds belonging to HUD, and a modification of the mortgage financing arrangements. In these circumstances, there is no conceivable threat that other United States monies will be subjected to execution if the counterclaimant is successful. Furthermore, this construction of the counterclaim is consistent with the general principle that immunity is not determined by the names of the titular parties but by the practical test of whether a judgment would have to be satisfied from the United States Treasury. *Federal Savings & Loan Ins. Corp. v. Quinn, supra.* We therefore hold that Section 1702 operates as a waiver of sovereign immunity in this case.

 Although Curtis-Dodd's counterclaim hurdles the barrier of sovereign immunity, it must still meet the independent tests of subject matter jurisdiction. The counterclaim does not allege any specific jurisdictional basis, but alleges in general terms that HUD has failed "to follow the laws and statutes of the United States and its own regulations." Amended Counterclaim, ¶ 4. The courts are split as to whether Section 1702 confers subject matter jurisdiction along with its waiver of sovereign immunity. See cases cited in *Trans-Bay Engineers & Builders, Inc. v. Hills,* 551 F.2d 370, 376 (D.C.Cir.1976). Even assuming that § 1702 is not a specific statutory grant of federal jurisdiction, however, we find that the counterclaim falls within the scope of federal question jurisdiction under 28 U.S.C. § 1331.

A similar jurisdictional question arose in *Trans-Bay, supra.* There, a building contractor brought an action against the Secretary of HUD to recover money retained as a "holdback" during construction of a federally-insured housing project. The contractor had completed construction and was due to be paid according to the terms of the construction agreement between the contractor and the project owner. However, before the funds could be dispersed, the project owner defaulted on its payments to the lender under the federally-insured mortgage. The lender and HUD then refused to release loan funds to cover the construction costs. The builder sued those two parties, seeking recovery of the funds as a third party beneficiary to the financing agreement, and alternatively under theories of suretyship and equitable lien/unjust enrichment. In addition to diversity jurisdiction, the Court of Appeals found federal question jurisdiction over the contractor's complaint, stating that:

> Here we are asked to determine whether the Secretary of HUD has an obligation to plaintiff Trans-Bay that is not rooted in a contract between them, but rather on equitable rights generated by HUD's course of activities pursuant to federal statutes, including the contracts it has sponsored, and prescribed for others, as a condition of federal aid. The claim of right is dependent on federal common law. . . . Congress enacted § 236 of the National Housing Act to encourage participation of private capital in housing construction and rehabilitation. The success of this program clearly depends on the rights and obligations of the various parties, including the supervisor and guarantor, HUD. What governs their rights is not only the contracts they hold, but also the responsibilities of HUD, not limited to contracts signed by HUD, but including responsibilities and duties generated by its activities in furtherance of the Housing Act, including the sponsorship and prescription of contracts signed by others. . . . A claim "arises under the laws of the United States" if the

disposition of issues stated in the complaint requires the application of federal common law. 551 F.2d at 377–78 (Citations omitted).

In describing the "equitable rights generated by HUD's course of activities," the court emphasized that HUD was engaged in a program of inducing private construction for the public benefit, had effective control over all agreements and documents, utilized a system of community-based ownership by establishing non-profit, no-asset corporations which were the "creatures of HUD," and provided insurance and financing which greatly limited the risks of the lender and the project owner. Because HUD exercised such overarching control and protected so many of the parties from unlimited financial risks, the court found that it would be inequitable under principles of federal common law for HUD to argue that the contractor freely assumed the risk of loss created by the owner's insolvency.

Curtis-Dodd's counterclaim alleges that a comparable course of conduct by HUD has given rise to equitable obligations running in its favor. Curtis-Dodd claims that after acquiring the project, it successfully managed and developed the property, turning it into an economically viable housing project. Meanwhile, HUD allegedly had failed to enforce its own regulations and supervise the mortgagee or the original mortgagor (SCA) to insure that the rental funds were properly collected, accounted for, and applied to the outstanding indebtedness. As a result, a large delinquency was created against the mortgage, leading to default. As in *Trans-Bay,* Curtis-Dodd's claim of equitable rights flowing from HUD's course of activities pursuant to federal statutes and regulations, including loan agreements insured under federal law, is dependent on federal common law. Like the building

contractor in *Trans-Bay,* Curtis-Dodd is a third party to the financing agreements between the original mortgagor (nominally American National but actually SCA) and the mortgage company whose loan was federally insured. The responsibilities and duties generated by HUD's activities in furtherance of the Housing Act created a claim arising under federal law which falls within the federal question jurisdiction of 28 U.S.C. § 1331(a).[1]

The Government's third ground for dismissing the counterclaim is that it fails to state a claim on which relief can be granted. The Government relies on a line of decisions beginning with *United States v. Neustadt,* 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961), which have held that the National Housing Act creates no duty owed by the Secretary to an individual mortgagor. See cases cited in *United States v. Chester Heights Associates,* 406 F.Supp. 600, 605 (D.S.C.1976). In response, Curtis-Dodd cites *Brown v. Lynn,* 385 F.Supp. 986 (N.D.Ill.1974) for the proposition that HUD regulations create duties which can be enforced by mortgagors. We find neither decision to be completely dispositive of the issues before us.

In *Neustadt,* the plaintiff-owner of a home with a federally insured mortgage brought an action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) against the FHA for negligent misrepresentation in its inspection and appraisal of the home. The Court, after holding § 1346(b) inapplicable to negligent misrepresentations, discussed the claim that the FHA owed plaintiffs a duty to accurately appraise their home:

> [I]t had been recognized in Congress that FHA appraisals would be a matter of public record, and would thus inure, incidentally, to the benefit of prospective

---

1. We also believe that Curtis-Dodd's counterclaim meets the tests for a compulsory counterclaim under Rule 13(a), Fed.R.Civ.P., and therefore falls within the scope of ancillary jurisdiction. 3 Moore's Federal Practice ¶ 13.15[1] (2d ed. 1974). The Seventh Circuit has recognized that the "same transaction or occurrence" test of Rule 13(a) should be given a liberal interpretation and should be judged according to

whether or not there is a logical relationship between the claims. *Warshawsky & Co. v. Arcata National Corp.,* 552 F.2d 1257, 1261 (7th Cir. 1977). Curtis-Dodd's counterclaim encompasses a course of dealing between HUD and the parties to the financing agreement which allegedly contributed to or caused the present foreclosure action. It thus is inextricably connected to the Government's claim.

home purchasers . . . But at the same time, it was repeatedly emphasized that the primary and predominant objective of the appraisal system was "the protection of the Government and its insurance funds;" that the mortgage insurance program was not designed to insure anything other than the repayment of loans made by lender-mortgagees; and that "there is no legal relationship between the FHA and the individual mortgagor." Never once was it even intimated that, by an FHA appraisal, the Government would, in any sense, represent or guarantee to the purchaser that he was receiving a certain value for his money. 366 U.S. at 708–09, 81 S.Ct. at 1301 (Citations omitted).

The Government implies that *Neustadt* and its progeny should be given a broad reading, and argues that they extinguish any duty running between the FHA and a mortgagor. We do not believe that the Court in *Neustadt* intended to immunize the FHA from all responsibility to mortgagors. Although the Court's quotation of the statement that "there is no legal relationship between the FHA and the individual mortgagor" paints with a broad brush, that statement was made in the context of a Congressional analysis of the FHA appraisal system and can not sensibly be construed as encompassing all facets of the FHA's operations. See 1954 U.S.Code Cong. & Admin.News, pp. 2828–29.

The present case is totally unrelated to appraisal procedures, and instead concerns HUD's monitoring of financing agreements under the Act. The Court in *Neustadt* rejected a theory of FHA liability based on a warranty of habitability or value, because the "fundamental design" of the program was to set up a system of mortgage repayment insurance rather than homeowners' insurance. 366 U.S. at 709, 81 S.Ct. 1294. Accurate appraisals protected the integrity of the loan, and thus protected the insurance funds of the Federal Government. Curtis-Dodd does not seek to hold the Government liable for defects in the construction or condition of their property, but rather seeks to hold HUD accountable for the proper functioning of its mortgage insurance procedures. The counterclaim would protect the integrity of that financing system by recouping all misapplied funds which properly belong to HUD. Hence, Curtis-Dodd's action furthers the goal that was retarded by the *Neustadt* action—protection of the system of mortgage repayment insurance. We therefore find *Neustadt* and its progeny inapplicable to this case.

Curtis-Dodd relies on *Brown v. Lynn, supra,* for the creation of a duty for HUD to supervise mortgagees and mortgagors in federal housing programs. In that case, a number of individual mortgagors brought a class action alleging, in part, that HUD had violated its statutory and regulatory obligations under the National Housing Act by permitting precipitate foreclosure proceedings to be instituted by federally-insured mortgagees. The plaintiffs claimed that the mortgagees had made no attempt to utilize alternatives to foreclosure that were authorized by HUD regulations, such as an extension or recasting of the mortgage, and that HUD failed to enforce or even encourage the use of these procedures. As a result, plaintiffs were allegedly deprived of their rights as third party beneficiaries of the mortgage insurance contracts entered into with respect to their property. They sought injunctive relief compelling enforcement of the regulations and monetary damages for any violations.

In holding that the complaint stated a cause of action against HUD, Judge Will stated that HUD's failure to insure that its guidelines on foreclosure were followed could constitute an abuse of discretion under the Act and a violation of HUD's obligations to low income homeowners. Rejecting the argument that the guidelines are only suggestions which HUD need not enforce, the court held, at 385 F.Supp. 998, that:

> HUD had and has a statutory obligation to formulate and carry out a program reasonably calculated to provide a decent home and a suitable living environment for every American family. 42 U.S.C. § 1441.

And HUD's failure to enforce a regulatory scheme which would prevent premature foreclosure, if proved by the *Brown* plaintiffs, would "stand[s] in direct contravention of the national housing goal." *Id.* at 999.

The *Brown* decision thus supports the principle that mortgagors can seek injunctive relief to require HUD to supervise mortgagees so as to prevent quick foreclosures. Curtis-Dodd has an interest in the property similar to the mortgagor-homeowners in *Brown*. Assuming for the purpose of the motion to dismiss that Curtis-Dodd is in fact the beneficial owner of the property, it has the responsibility of assuring that funds generated by the project are applied to the mortgage indebtedness. Its duty to make mortgage payments and its equitable ownership of the property make it a functional mortgagor even though its trustee nominally controlled payments on the mortgage through the trust agreement. Furthermore, the HUD regulations controlling § 221(d)(4) mortgages clearly give HUD the power to "regulate and restrict the mortgagor as long as the Commissioner [2] is the insurer, holder, or reinsurer of the mortgage." 24 C.F.R. § 221.529. Other sections detail the responsibilities which mortgagors must exercise in their activities under HUD programs. *See* 24 C.F.R. §§ 221.530–221.535a. The court in *Brown* held that these guidelines are not mere suggestions that HUD may or may not enforce, but are legal obligations enforceable by the beneficiaries of HUD programs. 385 F.Supp. at 998.

Nevertheless, there are several factors operating here which distinguish this case from *Brown* and make us hesitate in extending HUD's duty to supervise and be responsible for the conduct challenged in the counterclaim. In *Brown,* HUD allegedly failed to supervise foreclosure procedures instituted by mortgagees. The focus of the *Brown* complaint was that mortgagees acted with unjustifiable haste in foreclosure and failed to use alternative refinancing procedures. The only misstep by the plaintiff-mortgagors involved their temporary or partial inability to make timely mortgage payments. Plaintiffs, who were the supposed beneficiaries of the federal housing program, sought to compel HUD to intervene on their behalf to prevent premature foreclosures by mortgagees.

In the present case, Curtis-Dodd is not attempting to force HUD to shield it from overeager mortgagees. Its counterclaim is directed primarily at shielding itself from the misconduct of its predecessor in interest. SCA allegedly diverted rental income, built up large mortgage arrearages, and allowed the project to fall into disrepair. This misconduct would have constituted a breach of the regulatory agreement between SCA and HUD. That agreement imposed on SCA the obligations to apply the rental income to the mortgage indebtedness, to keep satisfactory financial records, and to maintain the premises in good repair. These duties are the same as those imposed on mortgagors by HUD regulations. 24 C.F.R. §§ 207.19(f) and 221.530. Theoretically, HUD would have a cause of action for damages against SCA and its partners for the tort of waste and for breach of contract. *United States v. Haddon Haciendas Co.,* 541 F.2d 777 (9th Cir. 1976). HUD had no comparable legal relationship or remedy against the mortgagors in *Brown*. SCA could not have defended a foreclosure action against itself on the basis that HUD failed to adequately supervise its actions and prevent it from committing waste and breaching its contract, or that HUD failed to prosecute it to recover the misapplied funds. As the assignee of SCA, Curtis-Dodd would ordinarily take the property subject to the same restrictions and defects as the property had in the hands of the assignor. The assignee stands in the shoes of its assignor. *Nickell v. United States,* 355 F.2d 73 (10th Cir. 1966); 6A C.J.S. *Assignments* § 88. An assignee can not sue if the assignor could not have maintained the action. We have been cited to no authority which would allow Curtis-Dodd to hold HUD partially responsible for

---

**2.** The Commissioner is an Assistant Secretary of HUD. 24 C.F.R. § 200.40.

the tortious and contractual misconduct of Curtis-Dodd's assignor. We therefore hold that the counterclaim fails to state a claim upon which relief can be granted insofar as it seeks to hold HUD responsible for the mortgage default by HUD's alleged failure to monitor the conduct of SCA, the original mortgagor of the property.

■ Finally, we are confronted with the Government's motion for summary judgment, and for the entry of a decree of foreclosure. We believe that there are factual questions arising out of sections of Curtis-Dodd's counterclaim which present equitable defenses to the foreclosure action. Although the major part of that counterclaim is concerned with laying the onus of default at the door of SCA (and, vicariously, HUD as well) and therefore fails to state a claim, Curtis-Dodd has also alleged that HUD has refused to avoid foreclosure by considering a modification, recasting, extension, or refinancing of the mortgage. These alternatives are expressly authorized by HUD regulations. 24 C.F.R. §§ 203.340, 203.342 and 207.256b.[3] To this extent the counterclaim does raise an affirmative defense to foreclosure. The court in *Brown* recognized that HUD has a statutory obligation to take action to prevent foreclosures by applying alternative methods of financing in appropriate cases. 385 F.Supp. at 1000. If the allegations of the counterclaim are correct and HUD has disregarded the less drastic forbearance provisions in the regulations, Curtis-Dodd has a valid defense to a "quick" foreclosure. As stated in the court's second opinion in *Brown v. Lynn*, 392 F.Supp. 559, 562–63 (N.D.Ill. 1975):

> On the theory that the guidelines are sensible, equitable standards of conduct, consistent with, and issued in furtherance of, the national housing goals, foreclosure courts can, and in appropriate instances should, direct the parties to pursue and exhaust the alternatives to foreclosure enumerated in the Handbook. Merely

rubber-stamping mortgagees' foreclosure actions, when they have acted barely within the formal legal bounds of these loosely defined housing programs, will contribute further to the needless loss of homes and to the creation of virtual ghost areas within our inner cities.

In addition, to justify foreclosure, the United States must show more than the simple facts that the mortgage is in default and the project lacks financial promise. Faced with a similar contention, the court in *Kent Farm Co. v. Hills*, 417 F.Supp. 297, 301 (D.D.C.1976) said:

> . . . HUD must show more than a legal right to foreclose. HUD is not simply a banker. Before it acts because of default on a project clearly otherwise meeting housing objectives it must consider national housing policy and decide what further steps authorized by Congress it will take to assure continuity of the decent, safe, sanitary, low-cost housing then being provided.

In support of its motion for summary judgment, the Government has only presented us with data indicating the mortgagor is incurably in default. Although HUD possesses the authority to foreclose under § 207(k) of the Act, 12 U.S.C. § 1713(k), that authority is tempered by and subservient to HUD's overall responsibilities under the Act to further national housing policy. 42 U.S.C. § 1441; *Kent Farm Co. v. Hills, supra*. Curtis-Dodd's counterclaim alleges that foreclosure at this time will result in large governmental losses, perhaps as much as $1,000,000, because the property's appraised value and income generating potential is insufficient to cover the projected outstanding indebtedness. In addition, the Government admits that Curtis-Dodd is performing its management functions "admirably," yet presents no plan for managing the property on a better or even a comparable level after foreclosure. Consequently, we cannot conclude on the present record that foreclosure is consistent with HUD's statutory obligations.

---

**3.** These regulations are incorporated by reference into the regulations governing Section 221 mortgages. 24 C.F.R. §§ 221.251, 221.751.

The Government's motion for summary judgment is denied. Curtis-Dodd's counterclaim is dismissed except for the equitable defenses that HUD disregarded the forbearance provisions in its regulations and that foreclosure at this stage would contravene HUD's statutory mandate to further national housing policy. Cause set for report on status on Friday, December 16, 1977 at 9:30 a. m.