**UNITED STATES of America,**
**Appellee,**

v.

**WOODLAND TERRACE, INC.,**
**Appellant.**

**No. 8244.**

United States Court of Appeals
Fourth Circuit.
Argued Jan. 23, 1961.
Decided Aug. 5, 1961.

---

506

Louis M. Shimel and J. C. Long, Charleston, S. C. (W. Turner Logan, Charleston, S. C., on the brief), for appellant.

George E. Lewis, Asst. U. S. Atty., Columbia, S. C. (N. Welch Morrisette, Jr., U. S. Atty., Columbia, S. C., on the brief), for appellee.

Before SOPER, HAYNSWORTH and BOREMAN, Circuit Judges.

HAYNSWORTH, Circuit Judge.

■ At issue is the right of the United States to foreclose a mortgage on a rental housing project, a mortgage which it had insured through the Federal Housing Administration and later, after the mortgagor's default, acquired by assignment. The Master, to whom the matter was referred, and the District Court found no impediment in the right of foreclosure. We find none.

Woodland Terrace, Inc. was organized in 1949 in South Carolina for the purpose of constructing and operating a rental housing project under § 608 of the National Housing Act.[1] Its charter was in the form approved by FHA. That agency was the owner of an entire issue of preferred stock, having an aggregate par value of $100. The project's individual sponsors acquired 259 shares of common stock having an aggregate par value of $25,900 in exchange for the land near Columbia, S. C., upon which the improvements were to be erected.

Woodland Terrace obtained from Wachovia Bank and Trust Company a loan, insured by FHA, of $1,256,100 payable interest only through October 1950 and thereafter in monthly instalments of principal and interest of $5,757.12 over a period of approximately thirty-three years. The loan was evidenced by a note and secured by a mortgage on forms approved by FHA.

Woodland Terrace then constructed "garden type" apartment buildings on the land it had acquired from the holders of its common stock. It operated and managed the project until a receiver was appointed in these proceedings.

The mortgagor defaulted in the payment of the instalment on the loan due April 1, 1957 and of all subsequently accruing instalments. On May 28, 1957 it wrote to the district office of FHA saying it was unable to meet the April instalment. It explained its financial difficulty by reference to a current vacancy rate of twenty per cent which it attributed to an excess, in past years, of new

1. 12 U.S.C.A. § 1743.

housing starts over the increase of new families in the area. It expressed the hope that its occupancy rate would improve with continued curtailment in the construction of new houses and continued growth in population. It requested a "work-out arrangement."

The State Director of FHA responded on June 13, 1957. He reported that he was informed by the Washington Office of FHA that no consideration could be given the request of Woodland Terrace for a work-out arrangement until the mortgagee elected to assign the mortgage or to acquire the property for tender to FHA. He wrote again on June 27, 1957, however, to inform Woodland Terrace that FHA officials had decided to proceed to foreclosure as soon as the mortgage was assigned.[2]

The mortgage was assigned to FHA on July 12, 1957. Thereafter, these proceedings to foreclose the mortgage were commenced.

The mortgagor concedes it would have no defense to foreclosure by the mortgagee. The mortgage expressly contemplates foreclosure in the event of default and a deficiency judgment if the mortgaged property brings less than enough to satisfy the debt and costs. It relies upon representations which it construes as a promise by FHA not to exercise its right of foreclosure.

The United States actively promoted the construction of such projects by private business and the use of FHA insured financing. In doing so it promised to be a lenient and understanding creditor, but we agree with the District Court that it did nothing to relinquish its right of foreclosure of a mortgage in default assigned to it if it decided to pursue that course.

In passing the Veterans' Emergency Housing Act of 1946,[3] the Congress found that the combination of the return of veterans of World War II and a long-term housing shortage had created an unprecedented emergency. It called upon executive agencies to exercise their emergency and other powers toward the alleviation of the housing problem.

On December 23, 1946, President Truman announced that a vigorous housing program would be continued into 1947. He emphasized particularly the need of rental housing for returning veterans.

On January 2, 1947, the Commissioner of the Federal Housing Administration wrote to the directors of all FHA field offices, outlining a program for the construction of rental housing for veterans. Among other things, he outlined steps

---

2. This correspondence convinces the mortgagor there was no consideration of its request for a work-out arrangement. The request, however, was not without a background. FHA was informed of the financial affairs of Woodland Terrace. The parties were involved in a current controversy over them. FHA was seeking to have restored to Woodland Terrace:

(1) The profit made by a "related" construction company on the construction of the buildings and improvements,

(2) cash disbursed by Woodland Terrace in payment for a majority of its common stock which it had purchased pro rata from its common stockholders. (This transaction occurred before enactment of the special provisions relating to "collapsible corporations." See Burge v. Commissioner, 4 Cir., 253 F.2d 765; Spangler v. Commissioner, 4 Cir., 278 F. 2d 665; Bryan v. Commissioner, 4 Cir., 281 F.2d 238; Pomponio v. Commissioner, 4 Cir., 288 F.2d 827. Apparently, these disbursements were not included in the taxable income of the stockholder-recipients), and

(3) cash disbursed as ordinary, but substantial, dividends on the common stock (e. g. $400 per share, though apparently on the reduced number of shares outstanding after the earlier stock redemption).

The stockholders, denying they were obligated to restore anything to Woodland Terrace, had made an offer to pay $125,000 into the corporation on specified conditions. FHA had not accepted this conditional offer.

The merits of this earlier controversy are not before us. Its existence shows, however, that FHA, rightly or wrongly, was dissatisfied with the earlier conduct of the financial affairs of Woodland Terrace and was familiar with it.

3. 60 Stat. 207, § 1(a).

which had been taken to simplify procedures in the approval and financing of § 608 projects. He said action was being taken to expedite the handling of requests for prevailing wage determinations by the Department of Labor.[4] With respect to the adjustment of the terms of mortgages, he said:

"Adjustment of Section 608 Mortgage Terms

"So that housing projects constructed under the present emergency conditions may continue to maintain their competitive market position after the housing shortage is met, the Federal Housing Administration will, in collaboration with lending institutions, give consideration to a readjustment of project mortgage terms where it is deemed necessary."

Statements of similar import appeared in press releases and other documents. With the one exception noted below, they all clearly stated that in appropriate cases consideration would be given to the adjustment of mortgage terms, and committed the United States to no specific adjustment of the terms of any mortgage.

On January 7, 1947, the Assistant Commissioner sent to the directors of the field offices a circular which the directors disseminated to builders, realtors and others. This circular referred to President Truman's statement, the Commissioner's letter of January 2, 1947, and it listed a number of steps which had been taken to simplify procedures under § 608. In this list, there was the following paragraph:

"e. Action has been taken to expedite the handling of requests for prevailing wage determinations by the Department of Labor and provisions made for the adjustment of mortgage terms, where it is deemed necessary in order that rental proj-

ects, constructed under the present emergency, may continue to maintain their competitive market position."

This statement was clearly referable to procedures. The record discloses internal provisions for handling requests for the adjustment of mortgage terms in appropriate cases. Announcement of the establishment of such procedures cannot be construed as a general representation that, whenever earnings were adversely affected by low occupancy rates, mortgage terms would be so adjusted as to obviate all defaults. We agree with the District Court that these representations gave assurance of consideration of requests for modification of the terms of mortgages in appropriate cases, but cannot be construed as a relinquishment of the right of foreclosure.

There was also testimony that on January 15, 1947 at an area meeting sponsored by FHA for the information of people interested in considering construction of § 608 projects, representatives of FHA stated that, in the event of a default, FHA would exercise its right as preferred stockholder to take active charge of the management of the corporation and would operate the project, for the benefit of the common stockholders, until the default was remedied. Some of those who, over two years later, became the promoters and stockholders of Woodland Terrace testified they heard and relied upon such statements.

If these statements were made,[5] they do not aid the mortgagor here.

FHA's position as preferred stockholder and the charter provisions giving it the right, in specified circumstances, to replace the Board of Directors and assume active management of the company, were among the many things required by FHA as prerequisites to its insurance of the mortgage. These requirements were imposed for the protection of FHA,

---

4. Wages of construction workers on such projects were required to be not less than the prevailing wages in the area as determined by the Department of Labor.

5. The findings below do not resolve the factual question.

not for the benefit of the holders of the common stock of the mortgagor. Doubtless, if FHA exercised the right to assume immediate control of the affairs of the mortgagor, it would have a fiduciary duty of conservation and avoidance of waste of the stockholders' equity, if there was one. The naked, unexercised power, however, is not inconsistent with the right of foreclosure. Whether FHA could have pursued both remedies at once, it clearly could elect to pursue either.

If, in these circumstances, representatives of FHA made the statements attributed to them, that the right of foreclosure would not be exercised and the right of management would be exercised solely for the possible advantage of the common stockholders and not for the minimization of FHA losses, their statements were in conflict with the purpose and intent of the statute and the regulations. Such unauthorized statements cannot bind the United States or work an estoppel against its exercise of a right clearly defined in the statute and reserved in the mortgage.[6]

These statements and the written representations relating to modification of mortgage terms were made early in 1947. Woodland Terrace was organized on April 12, 1949 and its note and mortgage were dated May 5, 1949. In the intervening two years, nothing resembling the mortgagor's interpretation of the written representations or the oral statements had become embodied in the statute, in FHA's detailed regulations or in its approved mortgage or charter forms. Because of this, the District Court and the Master advanced the alternative ground that resort to the written representations and the oral statements to modify the terms of the integrated agreement were barred by the parol evidence rule. There may be justification for the alternative ground, for FHA, though not

a formal party to the mortgage, was the controlling party in fact and through its commitment and insuring agreement it was a formal party to the transaction.

We need not consider the parol evidence rule, for we think the primary ground is sufficient, that the written representations, properly interpreted, are not inconsistent with foreclosure here and that the oral statements, if made at all, are not binding. These views, however, are buttressed by the fact that in 1949 Woodland Terrace accepted the prescribed charter provisions, subscribed unreservedly to the mortgage and subjected itself unconditionally to the governing regulations of FHA. If its sponsors then thought what they now assert, it would be expected that they would have spoken then of their claim of an inconsistent agreement.

Next, the mortgagor seeks to bring itself within the rule that agency action in violation of its own procedural regulations is invalid. It says the record does not show that local representatives of FHA extended aid or advice to it or made any recommendation as to modification of mortgage terms as required or authorized by its operating manuals. The mortgagor, however, undertook to show no departure from controlling procedural regulations. It contends only that the record does not contain affirmative evidence of procedural regularity.

FHA was not required to offer such evidence. It would be wholly useless to require it in every foreclosure proceeding to affirmatively prove procedural regularity at all levels with respect to every step, when no evidence of irregularity had been offered. The burden of going forward was upon the mortgagor.[7]

Finally, the mortgagor contends that FHA is not entitled to a deficiency judgment. The mortgage provides for such a judgment, if, on foreclosure, the

---

6. United States v. Anderson Apartments, Inc., D.C.W.D.S.C., 114 F.Supp. 69.

7. See United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499,

98 L.Ed. 681; Shaughnessy v. United States ex rel. Accardi, 349 U.S. 280, 75 S.Ct. 746, 99 L.Ed. 1074; Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403.

proceeds of sale of the mortgaged property are insufficient to satisfy the debt. Woodland Terrace says, however, that FHA was prohibited from being a mortgagee, being limited to insuring against loss financial institutions which were approved mortgagees. This leads it to the conclusion that FHA, as assignee of an approved mortgagee, may pursue only those remedies provided by the mortgage or by local law which were specifically authorized by Congress.

The conclusion is not required by the premise. The restriction was for the purpose of conserving the funds of FHA. It was to make certain that FHA did not undertake the direct financing of new housing but limited itself to the protection against loss of financial institutions which, with FHA approval, did finance such construction. There is nothing in the restriction or its purpose to suggest that FHA, as assignee, may not exercise remedial rights which the mortgagor expressly conferred upon the mortgagee and its assignees.

It is true that, when Congress enacted § 608 [8] it incorporated by reference the provisions of § 207(k) [9] which gives FHA the right to foreclose mortgages which it has acquired by assignment and, pending acquisition of title to the mortgaged property, to exercise all of the rights of a mortgage. It did not incorporate by reference the provisions of § 207(*l*), [10] which, among other things, authorizes FHA "to pursue to final collection by way of compromise or otherwise all claims assigned" to it in connection with transfers to it of insured mortgages or mortgaged property.

However, § 608, itself, specifically contemplates the assignment to FHA of "all claims of the mortgagee against the mortgagor or others arising out of the mortgage transaction." [11] If Congress had intended to prohibit FHA enforcement of such claims, it would have been purposeless to authorize their acquisition and to condition the mortgagee's right to the

benefit of the insurance upon their assignment. Indeed, prosecution of such claims as an incident of foreclosure would seem to be the exercise of one of the rights of the mortgagee authorized by § 207(k), incorporated by reference in § 608. When, in a foreclosure proceeding, FHA seeks a deficiency judgment, it exercises that right of the mortgagee before, and, therefore, "pending," its acquisition of title to the mortgaged property within the meaning of § 207(k).

We find no error in the judgment of the District Court.

Affirmed.

---

8. 12 U.S.C.A. § 1743(f).

9. 12 U.S.C.A. § 1713(k).

10. 12 U.S.C.A. § 1713(*l*).

