**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**WINTHROP TOWERS, a limited partnership, and Metropolitan Bank and Trust Company as Trustee under Trust 1037, Defendants–Appellants.**

No. 79–2055.

United States Court of Appeals,
Seventh Circuit.

Argued April 29, 1980.
Decided Aug. 29, 1980.

David V. Kahn, Chicago, Ill., for defendants–appellants.

John H. Mahoney, Dept. of Housing and Urban Development, Chicago, Ill., argued for plaintiff–appellee; Mary A. Thomas, Frederick H. Branding, Asst. U. S. Attys., Thomas P. Sullivan, U. S. Atty., Chicago, Ill., on brief.

Before WOOD, Circuit Judge, MARKEY, Chief Judge,* and CUDAHY, Circuit Judge.

CUDAHY, Circuit Judge.

This is an action brought by the United States, on behalf of the Secretary of Housing and Urban Development (the "Secretary" and "HUD") to foreclose a federally insured mortgage because the mortgage loan was in default. The defendant mortgagor, Winthrop Towers, admitted that the loan was in default but raised four affirma-

---

* The Honorable Howard T. Markey, Chief Judge of the United States Court of Customs and Patent Appeals, is sitting by designation.

tive defenses to HUD's action. The district court concluded that the Secretary's decision to foreclose such a mortgage loan was "committed to agency discretion by law" and therefore could not be reviewed under the Administrative Procedure Act, 5 U.S.C. § 701, so it granted HUD's motion for summary judgment. *United States v. Winthrop Towers*, 475 F.Supp. 320 (N.D.Ill. 1979). The district court based its conclusion on a finding that "there was no law to apply," but we disagree with this finding. We therefore affirm part of the district court order on different grounds, reverse the remainder and remand the case to the district court for further proceedings in accordance with this opinion.

*Facts*

Defendant Winthrop Towers is a limited partnership which is the beneficial owner of property in the Uptown area of Chicago known as Winthrop Towers. Defendant Metropolitan Bank and Trust Company is the trustee of the land trust which holds title to the Winthrop Towers property. In September 1968 defendants entered into a complicated series of agreements with various parties pursuant to which it granted a non–recourse mortgage on the Winthrop Towers property in return for a $4,720,700 loan at a below market interest rate. The loan was made under § 221(d)(3) of the National Housing Act, 12 U.S.C. § 1715*l* (d)(3). HUD insured the mortgage to the extent of advances and in return defendants entered into a regulatory agreement with HUD. The regulatory agreement governs tenant eligibility, rent levels and other aspects of the project's management. It also limits the annual distribution to defendants to 6% of their equity investment.

The proceeds of this government insured loan were used to construct the Winthrop Towers housing project, a 281–unit, 19–story housing project for low and moderate income tenants. Defendants failed in December 1973 to meet their installment obligations under the mortgage loan. In March

1975 the then–insured mortgagee, Government National Mortgage Association, assigned its interest in the note and the mortgage to the Secretary of HUD in return for payment of its claim for loss. Thus HUD became the lawful owner of the note and the mortgage.

In April 1976 defendants entered into a "provisional workout arrangement" with HUD, which provided that defendants would make a lump sum payment to HUD of $250,000 followed by reduced mortgage payments beginning in July 1976. HUD officials later agreed to let defendants begin making the reduced mortgage payments in October 1976. Defendants defaulted on the payments due under this arrangement and in August 1977 plaintiff filed the instant action on behalf of HUD in the district court seeking foreclosure. In its complaint plaintiff alleged that defendants had "failed to pay the installment due December 1, 1973, prior to the due date of the next monthly installment and has made no subsequent payment sufficient to restore the loan to currency, by reason of which Plaintiff declares due the entire balance of principal." HUD also sought immediate possession of the property.[1]

In their answer defendants admitted that "certain payments have not been made in accordance with the original terms of the Note and Mortgage." However defendants also stated that but for "HUD's departures from its own clearly established policies and regulations, as set forth in Affirmative Defenses one through four, defendants would have made all payments required" under the provisional workout arrangement. (Defendants' Answer, pp. 2–3).

Defendant's first affirmative defense alleges that HUD had imposed a nationwide moratorium on foreclosures of HUD–held mortgages on projects such as Winthrop Towers, so it was arbitrary and capricious to bring the instant action to foreclose. Defendants also state in the alternative that if the moratorium was limited only to

---

1. According to the complaint, the unpaid principal balance due under the mortgage loan is $4,506,530.67 in addition to interest of $241,-  104.07 through April 8, 1977, and additional interest at 3% per annum until the principal is paid.

the Boston area, the decision to treat projects located in Boston differently from those located in Chicago was arbitrary and capricious. Defendants' second affirmative defense alleges that foreclosure of the mortgage on Winthrop Towers would be in derogation of the goal of the National Housing Act to provide decent, safe and sanitary living quarters for low and moderate income families.

In their third affirmative defense defendants contend that HUD acted arbitrarily and capriciously by not making certain "Section 8" rent subsidies available to the present owners of Winthrop Towers even though HUD officials indicated that such funds might be available to a subsequent owner. Defendants also argue that HUD's failure to make such subsidies available to Winthrop Towers violates HUD's regulations concerning Section 8 funds, HUD's policy of avoiding foreclosure and national housing goals. The fourth affirmative defense alleges that HUD's "discriminatory and negligent treatment" of the Winthrop Towers project resulted in its financial difficulties. More specifically, defendants contend that HUD contributed to the default by (1) failing to include Winthrop Towers in its list of low and moderate income housing, (2) causing many similar low and moderate income housing projects to be constructed in the Uptown area and (3) releasing the builder from its bond although there were latent defects in the structure.

*Discussion*

The Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (the "APA"), governs judicial review of agency action. Section 702 provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to review thereof." Section 706(2) instructs the reviewing court to

"hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."

However review of agency action is not available "to the extent that . . . agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). In *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court stated that the exception for action "committed to agency discretion by law" is very narrow. "The legislative history of the Administrative Procedure Act indicates that it is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' S.Rep.No.752, 79th Cong., 1st Sess., 26 (1945)." 401 U.S. at 410, 91 S.Ct. at 820–821.

In the instant case the district court examined § 207(k) of the National Housing Act, 12 U.S.C. § 1713(k)(2),[2] which autho-

2. Sections 1713(k) and 1713(*l*) are incorporated into 12 U.S.C. § 1715*l* in 12 U.S.C. § 1715*l* (g)(2). Section 1713 provides in pertinent part:

Acquisition of property by conveyance or foreclosure

(k) The Secretary is authorized either to (1) acquire possession of and title to any property, covered by a mortgage insured under this section and assigned to him, by voluntary conveyance in extinguishment of the mortgage indebtedness, or (2) institute proceedings for foreclosure on the property covered by any such insured mortgage and prosecute such proceedings to conclusion. The Secretary at any sale under foreclosure may, in his discretion, for the protection of the General Insurance Fund, bid any sum up to but not in excess of the total unpaid indebtedness secured by the mortgage, plus taxes, insurance, foreclosure costs, fees, and other expenses, and may become the purchaser of the property at such sale. The Secretary is authorized to pay from the General Insurance Fund such sums as may be necessary to defray such taxes, insurance, costs, fees, and other expenses in connection with the acquisition or foreclosure of property under this section. Pending such acquisition by voluntary conveyance or by foreclosure, the Secretary is authorized, with respect to any mortgage assigned to him under the provisions of subsection (g) of this section, to exercise all the rights of a mortgagee under such mortgage, including the right to sell such mortgage, and to take such action and advance such sums as may be necessary to preserve or protect the lien of such mortgage.

rizes the Secretary to "institute proceedings for foreclosure on the property covered by any such insured mortgage and prosecute such proceedings to conclusion." The court observed that an earlier version of the National Housing Act required the Federal Housing Authority ("FHA") to acquire or foreclose a multifamily housing project within one year of default, but § 108 of the Housing Act of 1964 abolished the one year requirement. *United States v. Winthrop Towers*, 475 F.Supp. 320, 321 (N.D.Ill.1979). The court noted that the Senate Report on this section stated that eliminating this requirement

"'would give FHA latitude to consider each case on its own merits and to take such action as is required in each case. . . . [W]here there is no hope of reinstatement or the project is being mismanaged, foreclosure would be undertaken as soon as possible after a default. In this connection the committee wishes to explain that the primary purpose of the amendment is to give the FHA the discretion to work with the mortgagor, in a promising case only, for a reinstatement of the loan.' S.Rep. 1265, 88th Cong., 2nd Sess. at 39, 40 (1964)." [Emphasis omitted] 475 F.Supp. at 321–22.

The district court here concluded that the relevant statutes gave the Secretary of HUD "blanket authorization" to foreclose a mortgage like that of Winthrop Towers, "with no restrictions or standards whatsoever." 475 F.Supp. at 321. Defendants argued that the statement of national housing policy contained in 42 U.S.C. § 1441

should guide the court's review of HUD's actions but the district court considered the language of § 1441 too broad to provide a standard for review. *Id.*

Having found that the relevant statutory provisions did not restrict HUD's authority to foreclose the mortgage, the district court concluded that there "was no law to apply" within the meaning of *Overton Park, supra*, construing § 701(a) of the APA, so it could not review the Secretary's decision to foreclose the Winthrop Towers mortgage. The district court expressly declined to follow *Kent Farm Company v. Hills*, 417 F.Supp. 297 (D.D.C.1976) and *United States v. American National Bank and Trust Company of Chicago*, 443 F.Supp. 167 (N.D.Ill. 1977).

In *Kent Farm* the plaintiff–mortgagor sought a preliminary injunction to prevent HUD from foreclosing a mortgage which HUD originally had insured and later took by assignment after the mortgagor defaulted. The court in *Kent Farm* noted that

"a HUD moratorium [is] still in effect which establishes a policy dealing with contemplated foreclosures of certain types of HUD–held mortgages. . . . [The moratorium] is applicable to plaintiff's mortgage." 417 F.Supp. at 300–01.

The court held that HUD was required to apply the moratorium policy "in a reasoned, non–arbitrary manner that is consistent with the underlying congressional intent." 417 F.Supp. at 301. It concluded that although the decision to foreclose a mortgage

---

Handling and disposal of property; settlement of claims

(*l*) Notwithstanding any other provisions of law relating to the acquisition, handling, or disposal of real and other property by the United States, the Secretary shall also have power, for the protection of the interests of the General Insurance Fund, to pay out of the General Insurance Fund all expenses or charges in connection with, and to deal with, complete, reconstruct, rent, renovate, modernize, insure, make contracts for the management of, or establish suitable agencies for the management of, or sell for cash or credit or lease in his discretion, any property acquired by him under this section; and notwithstanding any other provision of law, the Secretary shall also have power to pursue to final collection by way of compromise or otherwise all claims assigned and transferred to him in connection with the assignment, transfer, and delivery provided for in this section, and at any time, upon default, to foreclose on any property secured by any mortgage assigned and transferred to or held by him:

*Provided,* That section 5 of Title 41 shall not be construed to apply to any contract for hazard insurance, or to any purchase or contract for services or supplies on account of such property if the amount thereof does not exceed $1,000.

42 U.S.C. § 3535(i) also authorizes the Secretary to foreclose.

which is in default is largely committed to HUD's discretion, it must exercise that discretion in light of national housing policy and its self–imposed moratorium. The court granted plaintiff's motion for a preliminary injunction because HUD had not shown more than a "legal right" to foreclose. 417 F.Supp. at 301–03.

In *American National Bank, supra,* HUD brought suit to foreclose a mortgage similar to the mortgages in *Kent Farm* and the instant case. An assignee of the original owner counterclaimed against HUD, alleging that HUD had failed to adequately supervise the project and had not tried to avoid foreclosure by applying alternative means of financing. The district court found that these counterclaims failed to state a cause of action but also held that HUD's failure to consider modifying, recasting, extending or refinancing the mortgage constituted an affirmative defense to the foreclosure action. The court held that HUD's authority to foreclose "is tempered by and subservient to HUD's overall responsibilities under the Act to further national housing policies." 443 F.Supp. at 175. The court concluded that foreclosure

was not consistent with HUD's statutory obligations under 42 U.S.C. § 1441 so it denied HUD's motion for summary judgment. 443 F.Supp. at 175–76.

■ On appeal defendants in the instant case argue that the district court erred in concluding that there was no law to apply and urge us to follow the approach used in *Kent Farm, American National Bank* and other cases. We agree that the district court erred in concluding that there was no law to apply so that the decision to foreclose could not be reviewed. As noted above, the Supreme Court in *Overton Park* stated that this exception to the general presumption in favor of judicial review is very narrow. In this case the law to be applied includes § 2 of the National Housing Act, 42 U.S.C. § 1441, which contains a detailed statement of national housing objectives, as well as 42 U.S.C. § 1441a, 42 U.S.C. § 1437 and 12 U.S.C. § 1715*l*(a).

■ Section 1441 specifically provides that HUD shall exercise its powers and perform its duties "consistently with the national housing policy declared by this Act. . . ."[3] This language compels our con-

---

3. 42 U.S.C. § 1441:

The Congress declares that the general welfare and security of the Nation and the health and living standards of its people require housing production and related community development sufficient to remedy the serious housing shortage, the elimination of substandard and other inadequate housing through the clearance of slums and blighted areas, and the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family, thus contributing to the development and redevelopment of communities and to the advancement of the growth, wealth, and security of the Nation. The Congress further declares that such production is necessary to enable the housing industry to make its full contribution toward an economy of maximum employment, production, and purchasing power. The policy to be followed in attaining the national housing objective established shall be: (1) private enterprise shall be encouraged to serve as large a part of the total need as it can; (2) governmental assistance shall be utilized where feasible to enable private enterprise to serve more of the total need; (3) appropriate local public bodies shall be encouraged and assisted to undertake positive programs of encouraging and

assisting the development of well–planned, integrated residential neighborhoods, the development and redevelopment of communities, and the production, at lower costs, of housing and sound standards of design, construction, livability, and size for adequate family life; (4) governmental assistance to eliminate substandard and other inadequate housing through the clearance of slums and blighted areas to facilitate community development and redevelopment, and to provide adequate housing for urban and rural nonfarm families with incomes so low that they are not being decently housed in new or existing housing shall be extended to those localities which estimate their own needs and demonstrate that these needs are not being met through reliance solely upon private enterprise, and without such aid; and (5) governmental assistance for decent, safe, and sanitary farm dwellings and related facilities shall be extended where the farm owner demonstrates that he lacks sufficient resources to provide such housing on his own account and is unable to secure necessary credit for such housing from other sources on terms and conditions which he could reasonably be expected to fulfill. The *Department of Housing and Urban Development,* and any

clusion that HUD's decision to foreclose may be reviewed to determine whether it is consistent with national housing objectives. This approach has been followed in several district court cases involving foreclosure. *See Kent Farm* and *American National Bank*, both *supra*, and *Brown v. Lynn*, 385 F.Supp. 986 (N.D.Ill.1974).

HUD argues that since several courts have held that tenants in a federally assisted housing project are not entitled to judicial review of rent increases, mortgagors of similar projects should not be entitled to judicial review of HUD's decision to foreclose. However, these rent increase cases do not control the instant case because they were not based on the "no law to apply" rationale announced in *Overton Park* and erroneously applied by the district court in the instant case. Thus in *Hahn v. Gottlieb*, 430 F.2d 1243, 1249–51 (1st Cir. 1970), the court denied judicial review of a rent increase because it found "clear and convincing evidence" that Congress intended to foreclose judicial review based on its analysis of the court's inability to review rent increase decisions, the apparent absence of need for judicial supervision and the undesirable impact of review on the administration of the projects. Similarly in *Langevin v. Chenango Court, Inc.*, 447 F.2d 296, 302–04 (2nd Cir. 1971), the court rejected judicial review of rent increases because it found that Congress intended to make such decisions unreviewable. *See also Harlib v. Lynn*, 511 F.2d 51, 56 (7th Cir. 1975) and *People's Rights Organization v. Bethlehem Associates*, 356 F.Supp. 407, 410–11 (E.D.Pa. 1973), *affirmed without opinion*, 487 F.2d 1395 (3rd Cir. 1973). None of these cases rely on the "no law to apply" rationale of *Overton Park*.

Nor have we found "clear and convincing evidence" of Congressional intent to deny judicial review in mortgage foreclosure cases sufficient to overcome the presumption that final agency action is generally subject to judicial review. Foreclosure differs significantly from rent increases because the imposition of rent increases is only a routine part of managerial duties. *Langevin v. Chenango Court, supra*, 447 F.2d at 303. Foreclosure is, hopefully, a far less common occurrence, and the resulting changes in ownership and management may well be very disruptive to the tenants whose housing problems the National Housing Act was intended to alleviate. We therefore agree that the language of § 1441 "is not precatory; HUD is obliged to follow these policies. Action taken without consideration of them, or in conflict with them, will not stand." *Commonwealth of Pennsylvania v. Lynn*, 501 F.2d 848, 855 (D.C.Cir. 1974).

To conclude that the foreclosure of a mortgage by HUD is unreviewable would be essentially to determine that HUD's discretion is unlimited. A number of decisions have proceeded on a contrary premise. But, if agency discretion could be calculated on a scale of 1 to 9, where 1 represents the narrowest and most constrained discretion and 9 represents unlimited (or unreviewable) discretion, then HUD's discretion in foreclosing a mortgage granted, for example, by a large commercial de-

---

other departments or agencies of the Federal Government having powers, functions, or duties with respect to housing, *shall exercise their powers, functions, and duties* under this or any other law, *consistently with the national housing policy declared by this Act* and in such manner as will facilitate sustained progress in attaining the national housing objective hereby established, and in such manner as will encourage and assist (1) the production of housing of sound standards of design, construction, livability, and size for adequate family life; (2) the reduction of the costs of housing without sacrifice of such sound standards; (3) the use of new designs, materials, techniques, and methods in residential construction, the use of standardized dimensions and methods of assembly of home -building materials and equipment, and the increase of efficiency in residential construction and maintenance; (4) the development of well--planned, integrated, residential neighborhoods and the development and redevelopment of communities; and (5) the stabilization of the housing industry at a high annual volume of residential construction. [Emphasis supplied].

*See also* 42 U.S.C. § 1441a; 42 U.S.C. § 1437; 12 U.S.C. § 1715*l*(a).

veloper would be somewhere in the area of 7 or 8. This is because large commercial developers presumably possess the resources and sophistication to make agreements they will be able to live with (*cf., Brown v. Lynn,* 385 F.Supp. 986, 999–1000 (N.D.Ill.1974)) and because the National Housing Act was primarily intended to benefit individuals who live in inadequate housing, not commercial developers (*M. B. Guran Company, Inc. v. City of Akron,* 546 F.2d 201, 204 (6th Cir. 1976) and *Cedar–Riverside Associates, Inc. v. City of Minneapolis,* 606 F.2d 254, 258 (8th Cir. 1979)).

Moreover, § 1441 "sets forth broad future objectives on a grand scale which are to be accomplished over a period of many years." *Alexander v. United States Department of Housing and Urban Development,* 555 F.2d 166, 171 (7th Cir. 1977), *affirmed,* 441 U.S. 39, 99 S.Ct. 1572, 60 L.Ed.2d 28 (1979). HUD has broad discretion "to choose between alternative methods of achieving the national housing objectives set forth in the several applicable statutes." *Shannon v. United States Department of Housing and Urban Development,* 436 F.2d 809, 819 (3rd Cir. 1970).

In exercising its discretion HUD may decide to foreclose in order to minimize losses from its insurance fund. HUD's interest in moving expeditiously to minimize such losses by foreclosure accords with national housing policy because such foreclosures preserve the assets of the insurance fund so that more projects may be insured in the future. Public money should not be put unnecessarily at risk by untoward administrative vacillation or judicial delays. *See United States v. Sylacauga Properties, Inc.,* 323 F.2d 487 (5th Cir. 1963). The decision to foreclose a mortgage is fundamentally of a business and administrative nature, requiring the exercise of HUD's business and administrative judgment. HUD may certainly give major consideration to preservation of the assets of the insurance fund and may weigh other factors relevant to national housing policy in formulating administrative procedures and in deciding whether to foreclose a particular mortgage.

Given the highly discretionary nature of the decisions HUD must make in the course of administering loans it has insured or taken by assignment, judicial review of HUD's decision to foreclose should be narrowly limited to the question whether HUD's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A). Certainly the very limited review of HUD's foreclosure decisions pursuant to § 706(2)(A) does not entail a *de novo* review of the merits of HUD's decision to foreclose. Nor should the availability of judicial review afford the defaulting mortgagor an opportunity to unduly prolong the foreclosure proceedings. Moreover since HUD has very broad discretion in this area it should not be required to introduce evidence of procedural regularity when it files suit to foreclose. Rather the mortgagor resisting foreclosure should bear the initial burden of introducing some evidence of HUD's arbitrary or capricious action, abuse of discretion or failure to comply with applicable law. *United States v. Woodland Terrace, Inc.,* 293 F.2d 505, 509 (4th Cir. 1961), *cert. denied,* 368 U.S. 940, 82 S.Ct. 381, 7 L.Ed.2d 338.

A motion for summary judgment which reaches the merits of a mortgagor's affirmative defenses is frequently an appropriate mechanism for determining whether there is any substance to the mortgagor's claims, given HUD's broad discretion in this area. For example, in *United States v. Chelsea Towers, Inc.,* 295 F.Supp. 1242 (D.N.J.1967), *appeal dismissed,* 404 F.2d 329 (3rd Cir. 1968), the court rejected the mortgagor's claim that it had a right to rely on the government's projections of certain rent levels and operating costs and granted summary judgment for the government. The court held that the government merely insured the mortgage so the mortgagor could not rely on the government's projections. *See also United States v. Sherman Gardens Company,* 298 F.Supp. 1332 (D.Nev.1967).

Since we have concluded that HUD's decision to foreclose is subject to limited judi-

cial review under § 706(2)(A), we must reverse the order of the district court in the instant case because it granted summary judgment on the ground that judicial review was unavailable. The government argued in the district court that it was entitled to summary judgment for two reasons: (1) because judicial review was not available and (2) because no genuine issue of material fact was presented by the record and the government was entitled to judgment as a matter of law. The district court did not consider the second basis for summary judgment so we remand the case to the district court in order for it to do so. As noted, we consider summary judgment an appropriate way to determine at an early stage the merit, if any, of a mortgagor's affirmative defenses. If no merit is perceived, foreclosure proceedings may go forward with expedition. We therefore strongly urge the district court to allow the parties to submit additional affidavits and briefs on remand if the court determines that this would be helpful.

■ HUD argues on appeal that we should reach the question whether it is entitled to summary judgment on the alternative basis it suggested in the district court. While a reviewing court may affirm an order granting summary judgment on grounds different from those relied upon by the district court,[4] we choose to exercise this option in only a limited respect. Thus we will resolve several legal issues clearly presented by the record at this point and allow the district court to determine whether there are questions of fact as to other issues.

■ Defendants' first affirmative defense involves HUD's self–imposed moratorium on foreclosure. The facts are not in dispute. Both parties agree that on January 14, 1975, the Secretary of HUD declared a nationwide moratorium on foreclosures of certain HUD–held mortgages which were in default, but on January 7,

1977, the Secretary of HUD lifted the moratorium on foreclosures. On January 19, 1977, the Secretary reinstituted the moratorium in the Boston area pending the report of a Task Force which was directed to study the problems of project owners in the Boston area. This action apparently was taken in response to concerns expressed by Senator Brooke. (*See* Defendants' Exhibits E, F, G, H, I, J and K). In October 1977 the Boston moratorium was lifted. (Affidavit of Donald A. Myers, p. 3).

Defendants first allege that there is "currently in effect a nationwide moratorium on foreclosures of projects like Winthrop Towers." This allegation is directly controverted by the Myers affidavit. Even if defendants' exhibits are viewed in a light most favorable to defendants they indicate only that the national moratorium was lifted in January 1977 and was reinstituted for a short time in Boston while that area's problems were studied. Defendants' allegation that a *nationwide* moratorium was currently in effect therefore cannot withstand plaintiff's motion for summary judgment.

■ Defendants also allege in the alternative that limiting the moratorium to the Boston area was arbitrary and capricious because the problems of multifamily projects in Boston were the same as the problems faced by Winthrop Towers. As noted above, the decision to foreclose is largely committed to HUD's discretion, although HUD's actions must not conflict with national housing policy. It may be true that projects in Chicago would have benefited from a moratorium as much as projects in the Boston area, but this fact, standing alone, does not mean that the Secretary's decision to reinstitute the moratorium on a limited basis was arbitrary and capricious or an abuse of discretion. Defendants' allegations to the contrary therefore do not, without more, constitute a legally cognizable defense to the foreclosure action.

---

4. "[I]t is proper for this court to affirm a summary judgment on any ground that appears from the record, whether or not the trial court relied on it." *Helena Rubinstein v. Bau*, 433

F.2d 1021, 1023 (9th Cir. 1970). *See also* Wright and Miller, Federal Practice and Procedure § 2716 (1973).

■ In their fourth affirmative defense defendants allege that HUD caused so many similar rental units to be built in the Uptown area that, as HUD had projected in its mortgage insurance commitment letter, Winthrop Towers never became economically viable. HUD also allegedly approved the quality of the construction and negligently released the builder from its bond even though there were latent defects in the building.

The court in *United States v. Sherman Gardens Company*, 298 F.Supp. 1332 (D.Nev.1967), rejected a similar allegation as providing a legally sufficient defense to foreclosure. In *Sherman Gardens* the FHA issued a commitment for mortgage insurance after certifying the project's economic feasibility. The FHA subsequently financed several housing projects which were in direct competition with Sherman Gardens. The court held that these facts did not constitute an affirmative defense to the government's foreclosure action because "[t]his was a simple loan transaction. The Government did not guarantee a profitable operation . . . ." 298 F.Supp. at 1334. We agree with this analysis and hold that in the instant case defendants' claim that HUD caused too many competing projects to be built in Uptown does not state an affirmative defense. Such a limitation was not part of the parties' agreement and defendants cannot, as a matter of law, rely on HUD's assessment of economic viability contained in the mortgage insurance commitment letter.

■ As to HUD's alleged negligence in inspecting the project and releasing the builders, we conclude that these facts do not give rise to an affirmative defense. HUD's main duty is to the mortgagee, not the mortgagor. HUD may not violate national housing policies but HUD's negligence does not necessarily constitute a violation of those policies such as to give rise to an affirmative defense. Thus in *United States v. Chelsea Towers, Inc.*, 295 F.Supp. 1242 (D.N.J.1967), *appealed dismissed*, 404 F.2d 329 (3rd Cir. 1968), the court granted the government's motion for summary judgment in a foreclosure action in spite of defendants' claim that the FHA had misrepresented operating costs and rent levels. In the instant case the fact that HUD may have been negligent in inspecting the project and releasing the builders does not constitute an affirmative defense to a foreclosure suit. We recognize that if HUD's duty to inspect and approve of the construction was part of the agreement between HUD and the mortgagor, HUD's negligence might conceivably constitute an affirmative defense.

As to defendants' other defenses, the district court, bearing in mind our expansive view of HUD's discretion and HUD's unarguable duty to protect the public treasury, may find summary judgment available either on existing or additional affidavits and other documents. We therefore remand the case to the district court for further proceedings not inconsistent with this opinion. Each party is to bear its own costs on this appeal.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

MARKEY, C. J., dissents.