**UNITED STATES of America, Plaintiff,**

v.

**Doris THOMAS, et al., Defendants.**

**Doris THOMAS, Cross-Plaintiff,**

v.

**VILLAGE OF MAYWOOD, et al., Cross-Defendants.**

**Carol JAROCKI, et al., Intervenors-Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 83 C 3752.

United States District Court, N.D. Illinois, E.D.

Aug. 27, 1985.

Linda A. Wawzenski, Asst. U.S. Atty., Chicago, Ill., for the U.S.

Peter M. Rosenthal, Ancel Glick Diamond Murphy & Cope, Chicago, Ill., for the Village of Maywood.

David R. Smith, Cole & Smith, Chicago, Ill., for Doris Thomas.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

This is an action to foreclose several mortgage liens on property located in the Village of Maywood, Cook County, Illinois (the "property"). The property houses a restaurant-banquet facility and several apartment units which are operated by defendant Doris Thomas Anderson ("Anderson").[1]

The United States has moved for reconsideration of its motion for summary judgment, originally presented to Judge Leighton of this Court. Intervening plaintiffs Carol Jarocki, Emil Marunde, Trudy Smith and Rudolph Kullmann and Richard Kullmann, as co-administrators of the estate of Margarethe Marunde (hereinafter "Intervenors") have also moved for summary judgment.

For the reasons stated below, the United States' motion for reconsideration is granted; summary judgment will be entered for the United States. The Intervenors' motion for summary judgment is also granted.

## DISCUSSION

### I. *Intervenors' Motion.*

Intervenors were the beneficiaries of a land trust which formerly held title to the property. On January 14, 1978, at the direction of the beneficiaries, the Chicago Title and Trust Company conveyed title to Anderson in fee simple. In return, Anderson executed a note (the "Note") in the principal amount of $40,000, bearing inter-

1. Anderson executed a trust deed for the property to the Maywood-Proviso State Bank as Trustee on June 26, 1981 and therefore is not the legal titleholder. Anderson is the beneficiary of the trust, however, and this suit seeks to extinguish whatever claim Anderson may have in the property.

est at the annual rate of nine and one-half percent. Monthly payments, commencing January 15, 1978, were due on the 15th day of each month in the amount of $372.86, with the principal balance remaining due and unpaid on December 15, 1987 to be paid on that date. The Note was secured by a trust deed in the nature of a mortgage which was duly recorded.

Payments were made on the Note on a regular basis (although in irregular amounts) from January of 1978 through July of 1979. Payment then ceased until October of 1979, then ceased again. Anderson again made regular payments on the Note from January of 1980 through March of 1981. Payment on the Note then came to a halt until November of 1981 when Anderson made one final payment of $765.12.

Intervenors have calculated that had Anderson made regular monthly payments in accordance with the Note's provisions, the remaining balance on the mortgage would have been $36,704.92 on August 15, 1981. Instead, on that date the principal and interest due amounted to $36,762.25. This state of default was not cured by Anderson's last payment in November of 1981. As of March 15, 1985, Intervenors contend, Anderson owed Intervenors the sum of $35,362.50 in principal and $12,672.60 in interest. In addition, interest continues to run at the per diem rate of $9.33.

Anderson does not dispute that she is in default under the Note. As a defense to summary judgment, Anderson states that she discontinued payment "due to the uncertainty with respect to the rehabilitation of the subject property." Anderson's brief in response to Intervenors' motion for summary judgment states that she intended to tender to Intervenors the sum of $26,477.13 (the amount which Anderson contends would be due had she not defaulted) within forty-five days of the date of her brief.

■ Anderson's "uncertainty" with respect to rehabilitation of the property, of course, is no excuse for nonpayment of the Note. In fact, Anderson executed the Note and was obliged to make payment thereunder before she was even aware that government funds were available for rehabilitation. Similarly, Anderson's tardy tendering of part of the amount in default is not a basis upon which this Court can deny Intervenors' right to foreclose.

The trust deed securing Intervenors' mortgage provided as follows:

> Mortgagors shall pay each item of indebtedness herein mentioned, both principal and interest, when due according to the terms hereof. At the option of the Holders of the Note, and without notice to Mortgagors, *all unpaid indebtedness secured by this Trust Deed* shall, notwithstanding anything in the Note or in this Trust Deed to the contrary, become due and payable (a) immediately in the case of default in making payment of any installment of principal or interest on the Note or (b) when default shall occur and continue to three days in the performance of any other agreement of the Mortgagors herein contained. (emphasis added)

Intervenors exercised their right to accelerate by filing their complaint.

■ Summary judgment, of course, is appropriate only when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). No genuine issue of material fact exists regarding Intervenors' right to foreclose their mortgage. No other party to this action has contested Intervenors' right to summary judgment foreclosing their mortgage or Intervenors' right to a declaration that their lien on the property is superior to the equitable interest of any other party to this action. Summary judgment for Intervenors, therefore will be granted.[2]

2. Intervenors are instructed to submit a short accounting statement showing how they calculated (1) the sum of $48,034.10 ($35,362.50 as principal and $12,672.60 as interest) as the

II. *HUD's Motion.*

The heart of this case, however, is unrelated to the Intervenors' Note and mortgage. The case commenced when the United States, acting through the Department of Housing and Urban Development ("HUD"), filed suit to foreclose on *its* mortgage on the property. The events leading up to the filing of HUD's complaint are not in dispute.

■ HUD's Section 312 program was designed to provide low-cost loans for rehabilitation purposes to persons who might not otherwise qualify for such sizeable funds. (*See generally* 24 C.F.R. Part 510). Sometime during 1979 Anderson learned that HUD rehabilitation funds were available and that her property might be eligible for a low-interest loan. Anderson's initial loan application for $440,000, prepared with the help of personnel at the Maywood Community Development Department, was turned down by HUD. Her second application, dated September 13, 1979, requested the sum of $332,950. This application was approved. On October 30, 1979, Anderson, doing business as Chez Louisienne, executed and delivered her note in the amount of the loan. The note was secured by a mortgage on Anderson's property. The note bore interest at the rate of 3% per annum, provided for payment of monthly installments, and authorized the holder to accelerate the maturity should any installment remain unpaid on the due date of the next installment. The mortgage was recorded on December 29, 1979 in the Office of the Recorder of Deeds of Cook County, Illiois.

HUD's policies and regulations require that a local public agency administer Section 312 projects. At loan settlement, the local agency secures the borrower's endorsement and deposits the loan proceeds check in a rehabilitation escrow account. All disbursements from the escrow account are made payable jointly to the payee and the borrower; *i.e.*, the borrower must endorse any use of the loan proceeds. The local public agency is in charge of obtaining the borrower's endorsement on checks drawing funds from the escrow account and then transmitting the endorsed check to the payee.

There is no allegation that HUD failed to follow its procedures with regard to Anderson's loan. Anderson does contend that she never "directly" received the funds, never had control over the funds, and endorsed checks when instructed to do so only to ensure that contractors get paid. That the funds were received in accordance with HUD procedures and used to rehabilitate Anderson's property, however, is not in dispute.

According to the terms of the promissory note, monthly installments were to commence on April 1, 1980. Anderson contends that she was assured, however, that payments on the note would not be due until the project was completed.

Problems beset the project from the start. In order to save money, the rehabilitation project was bidded in component parts, which delayed the starting date. The general contractor turned out to be incompetent, and his contract had to be terminated. The Village realized, however, that despite the cost-cutting efforts, a "critical shortage" of funds was still apparent; between June of 1981 and January of 1982 the Village committed approximately $160,000 in Community Development Block Grant funds to the project.

Anderson failed to make any payments on the loan in 1980. In January of 1981 Anderson and the Village jointly requested HUD's forbearance in declaring the loan in default and a temporary suspension of payments. HUD agreed to a term of forbearance until July 31, 1981, two weeks after the expected completion date. In return for HUD's forbearance, Anderson executed an Extended Repayment Agreement in which she acknowledged the default and

amount due and owing on March 15, 1985; and (2) the sum of $9.33 as the amount of interest accruing daily on the debt.

promised to begin monthly payments on August 1, 1981. Anderson has not made any payment of principal or interest under this Agreement. In short, Anderson has not made any payment to HUD whatsoever. On June 1, 1983 the United States filed this foreclosure action.

Fourteen months after suit was filed, Anderson's counsel submitted to HUD a reinstatement proposal. HUD rejected the proposal since it lacked any commitment by the borrower to invest money in the project, detailed operating budgets or management proposals. Anderson's counsel, Mr. Smith, was informed of the deficiencies in the reinstatement proposal.

Mr. Smith then submitted a "Phase II Workout Proposal" which apparently again lacked a specific commitment from Anderson for investment of definite amounts of money and detailed operating budgets and management proposals. Phase II was also rejected by HUD.

Anderson has raised three affirmative defenses in her Answer to the foreclosure action. First, the Answer states that HUD violated its own regulations by failing to avoid foreclosure proceedings through alternative methods of financing, i.e., HUD failed to consider modifying, recasting, extending or refinancing the note and mortgage. Next, the Answer states that the loan funds "were at no time directed to [or] personally received by Defendant." Finally, Anderson has raised the affirmative defense that HUD failed to comply with its statutory mandate to further national housing policies and to fulfill its duty to supervise Section 312 projects in such a manner as to avoid foreclosure. Anderson has also counterclaimed for damages allegedly suffered as a result of HUD's failure to conduct its activities in accordance with its "Rehabilitation Financing Handbook."

### A. Alternative Methods of Financing.

Anderson's primary defense to summary judgment is that HUD failed to avoid foreclosure by considering alternative methods of financing or salvaging the project prior to foreclosing, in violation of its obligations under the National Housing Act, 42 U.S.C. § 1441.[3] Essentially Anderson contends that HUD's rejection of her refinancing proposal, submitted fourteen months after commencement of this action, was arbitrary and capricious and in total disregard of HUD's statutory obligation to promote national housing policies.

3. Indeed, Anderson appears to have conceded that this claim is the only defense to summary judgment. The following colloquy took place between Judge Leighton and defense counsel on April 25, 1985:

THE COURT: Tell me this: could you say it very briefly, what are the questions of fact that are present in this case that would preclude grant of the plaintiff's motion for summary judgment? What are the issues of fact to be resolved?

MR. SMITH: Well, I believe we touched on most of them, Your Honor. No. 1 is the obligation that HUD had and still has, I believe, to before initiating a foreclosure proceeding, that they at least try to work out a way of salvaging the problem. That has not been done.

\* \* \* \* \* \*

THE COURT: That is one. Now, what are the other issues of fact as to other categories of legal questions? What are the issues of fact?

MR. SMITH: As far as a defense to the summary judgment, I believe that is in essence the basic one.

There are some other things that we mentioned in our filings, the lack of inspection on the part of HUD when they had an obligation to do so because the reason for—whether or not that is an actual defense to a summary judgment might be a question, but the point we were trying to bring out is that had they inspected the property, the joint inspections that their own regulations require, then maybe the project could have been terminated at a point in time when no one was out a lot of money.

Again, I don't say that is necessarily a defense to the summary judgment. But I believe that read as a whole all of these things would be defenses to plaintiff's motion.

THE COURT: Anything else now?

MR. SMITH: I believe that is all with respect to the plaintiff ...

Anderson now adamantly claims that she did not "abandon" any claims at the hearing before Judge Leighton. It is difficult to understand this contention in light of the clear language to the contrary. The Court, however, will consider each of the affirmative defenses proffered.

Anderson has not identified any statute, regulatory provision or national housing policy that requires HUD to consider alternatives to foreclose. Moreover, Anderson has ignored the action HUD took in order to keep the rehabilitation project afloat. In response to Anderson's acknowledgment that the loan was in default and request for forbearance, HUD agreed to suspend obligations under the note for sixteen months while the project was completed.

■ Finally, HUD's rejection of Anderson's workout proposal was not arbitrary. The correspondence between Mr. Smith and HUD representatives clearly shows that HUD might have considered a workout proposal if it included a specific monetary commitment by the borrower, and detailed operating budgets and management proposals. HUD's letter of October 3, 1984 to Mr. Smith clearly evinces HUD's willingness to entertain a workout proposal provided it contained the requisite components:

Based upon your conversation with Mr. Jensen, it is our present understanding that the "Phase I Report and Recommendations" (April 1984) previously submitted to HUD on behalf of Ms. Thomas (and forwarded by our office to CMS) was not intended by your client to be a work-out proposal, but rather was submitted solely for the purpose of opening up a dialogue as to terms of a work-out arrangement for this loan that would be satisfactory to the Department. It is our further understanding that, prior to tendering a second submission, which would set forth a developed work-out proposal, with specific monetary commitments by the mortgagor, you would like the opportunity to discuss the parameters of acceptable workout arrangements with appropriate representatives of the Department. It is in response to that request that you are advised that Ms. Guthrie of CMS is the appropriate HUD contact person. Of course, HUD would not enter into any workout arrangement unless it was determined to be in the best interest of the Department.

Following your discussion with CMS, if you intend to submit a workout proposal for this loan on behalf of Ms. Thomas, you should send your comprehensive written proposal to Assistant U.S. Attorney Ann Wallace, with copies to both Ms. Guthrie and to this office. In light of the fact that this foreclosure action has already been protracted, we would ask that you submit any workout proposal to Ms. Wallace by COB October 19, 1984.

Defense counsel was provided with Ms. Guthrie's address and telephone number.

On October 23, 1984, Mr. Smith submitted the Phase II proposal. The proposal neither proposed any monetary commitment by Anderson nor included detailed operating budgets and management proposals. HUD has also represented, and Anderson has not contradicted, that the Phase II proposal required HUD to commit an additional $210,000 to the project. HUD informed Mr. Smith of the apparent defects in the proposal and justifiably wanted to know whether Smith's client could comply with its requirements before setting up a meeting.

Mr. Smith responded to HUD's letter merely by complaining about the "vague" questions posed by HUD. He further lamented that HUD's questions

provide no guidance as to what kind of information HUD is looking for which would make a proposal for Ms. Thomas acceptable to them. For example: the item 1 in your letter request [sic] specific committments [sic] for definite amounts of money. In this regard, please advise me as to what kind of committments [sic] HUD is looking for and definite amounts of money to do what? Item 2 of your letter refers detail [sic] operating budgets and management proposals. I am puzzled by this statement because the terminology used is appearing to request more than one budget and more than one proposal. The question that we have is why.

Negotiations on the work-out arrangement faltered at this point.

■ Anderson apparently believes that more than fourteen months after suit commenced she could propose a work-out arrangement with HUD that did not comply with HUD's minimum requirements for such an arrangement, and then use HUD's rejection of the proposal to defend against summary judgment. Anderson is mistaken. As the Seventh Circuit recently noted:

> [O]nce proceedings are commenced, any further business judgments made by HUD in its continued prosecution of the foreclosure action are immaterial and collateral to HUD's decision to foreclose and, therefore, wholly discretionary. The availability of judicial review of HUD's discretionary decisions was not meant to afford the defaulting mortgagor an opportunity to resist foreclosure by seeking review of the efforts taken by the parties during the course of litigation in attempting to cure the default and resolve related fiscal problems and thereby prolong the foreclosure proceedings.

*United States v. OCCI Co.*, 758 F.2d 1160, 1165 (7th Cir.1985).

In sum, Anderson has not raised a genuine issue of fact to support the affirmative defense that HUD acted arbitrarily or capriciously, or abused its discretion, by not exploring alternatives to foreclosure. As Judge Getzendanner of this Court has stated:

> HUD indicated its reasons for rejecting defendant's workout proposal, and defendants could have made a second proposal responsive to HUD's concerns. HUD was not obligated to formulate its own plan, at least on the facts presented in this case.

*United States v. American National Bank & Trust Co. of Chicago*, 595 F.Supp. 324, 325 (N.D.Ill.1983). The facts presented in this case similarly did not oblige HUD to formulate a plan to rescue the rehabilitation project.

### B. *Non-Receipt of Funds.*

Anderson's second affirmative defense claims that the funds directed for the rehabilitation project "were at no time directed to nor personally received by Defendant."

The gist of this defense apparently is that the Village and not Anderson had control over the funds and so HUD should look to the Village, not Anderson, for recovery of the debt. Although Anderson concedes that she signed disbursement checks for work done on the project, she contends that "she was ordered to do so" by Village officials so that work would not come to a halt.

■ The fact that Anderson never had cash in her hands is no affirmative defense to HUD's motion. Anderson received the entire benefit of the rehabilitation loan. Moreover, Anderson's attempt throughout the pleadings to characterize her position as that of a naive automoton who only did as she was told by scheming Village officials has no support in the record. In short, Anderson's second affirmative defense must fail.

### C. *National Housing Policy.*

■ Anderson's third affirmative defense is that HUD failed to fulfill national housing policy by not supervising and monitoring the rehabilitation project. A similar argument was raised by the defendant in *United States v. Winthrop Towers*, 628 F.2d 1028 (7th Cir.1980). The Seventh Circuit held that, absent an agreement requiring HUD to inspect and approve of construction, HUD's negligence in so doing did not constitute an affirmative defense to a foreclosure action. *Id.* at 1038. The argument was also raised as a counterclaim in a recent case before Judge McMillen of this Court, where HUD was alleged to have negligently inspected the work site and negligently permitted disbursements to be paid. Judge McMillen noted that "HUD had no affirmative or contractual obligation to make inspections except for its own benefit and protection.... Failure to perform this function is not actionable." *United States v. LaSalle National Bank*, No. 84 C 2294 (N.D.Ill. Feb. 6, 1985), slip op. at 4. Anderson has cited no contrary authority; indeed, as noted above, Mr. Smith has apparently conceded that HUD's

failure to supervise does not constitute an affirmative defense to this action. *See* fn. 3, *supra* at p. 9. Anderson's third affirmative defense, therefore, does not bar summary judgment.

### D. *Anderson's Counterclaim.*

Finally, Anderson has raised the counterclaim that HUD violated its "Rehabilitation Financing Handbook" when it failed to monitor, supervise and inspect the rehabilitation project. Defendant contends that as a result of HUD's violation of its duty to monitor, supervise and inspect the project, she suffered "great humiliation, embarrassment, the loss of personal financial resources and incurrence of debt...."

As noted by the Seventh Circuit in *Burroughs v. Hills*, 741 F.2d 1525 (7th Cir. 1984), "Uncertainty often exists whether a handbook is meant to be, or is inadvertently made to be, an independent source of legal rights or claims against the United States Government and its officials." *Id.* at 1529. The Seventh Circuit held that HUD's "Property Disposition Handbook" had no binding force but was entitled to notice to the extent that it was an official interpretation of statutes or regulations with which it did not conflict. *Id.* In denying plaintiffs any cause of action under the HUD handbook, the Court noted that "[e]fforts to enforce implied causes of action under the National Housing Legislation or the HUD Handbook, have frequently come under consideration of appellate courts, and have always failed." *Id.* at 1532.

The government concedes that the Handbook's procedures called for HUD inspections of the construction work, instead of· or in addition to inspections by the Village (which were carried out). The government contends, however, first that the HUD handbook conferred no legal rights upon Anderson entitling her to sue for a violation thereof; and second, even if it did confer legal rights, Anderson has not established that she suffered any injury by reason of HUD's failure to supervise and inspect the rehabilitation project.

HUD's Rehabilitation Handbook, like the Property Distribution Handbook at issue in *Burroughs,* appears to have been drafted for the internal use of HUD and the local public agencies assisting HUD in the administration of the Section 312 loan program. In particular, HUD's duty to inspect under Chapter 20 of the Handbook was designed to protect HUD, not the borrower, from payments for unsatisfactory work on a project. The Court holds, therefore, that the Rehabilitation Handbook did not confer any legal rights upon Anderson upon which she can base a cause of action against HUD.

Since this holding disposes of the counterclaim against HUD, the Court need not decide whether Anderson suffered injury by reason of HUD's alleged failure to inspect and supervise. The Court notes, however, that the record is bereft of any evidence of emotional distress suffered by Anderson as a result of HUD's alleged failure to inspect or supervise. No evidence has been presented to show that an inspection by HUD would have benefitted the project. In fact, an inspection eventually carried out by HUD at Anderson's request failed to reveal a single instance in which a contractor was paid improperly, or work was performed unsatisfactorily, or an inspection by Village officials was deficient.

In sum, Anderson's affirmative defenses and counterclaim must be dismissed and summary judgment in favor of the United States be granted.

### CONCLUSION

For the reasons set forth herein, Intervenors' and the United States' motions for summary judgment are GRANTED.